R. A. BRYAN AND RUBY M. BRYAN, PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

C. B. McNAIRY AND ROWENA A. McNAIRY, PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61626, 61627. Filed April 16, 1959.

*Stanley Worth, Esq.*, and *Edward S. Smith, Esq.*, for the petitioners. *Ralph V. Bradbury, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax and additions thereto as follows:

| Year | Docket No. | Income tax | Additions to tax | |
|---|---|---|---|---|
| | | | Sec. 294(d)(1)(A) | Sec. 294(d)(2) |
| 1951 | 61626 | $101,084.07 | $10,680.09 | |
| 1952 | | 16,893.75 | 3,467.58 | $2,108.43 |
| 1953 | | 21,590.79 | 5,500.93 | |
| 1951 | 61627 | 57,085.79 | 7,205.83 | |
| 1952 | | 25,997.13 | 3,031.33 | |
| 1953 | | 11,973.58 | 2,159.11 | |

In both dockets, the principal issues are whether the redemption of class B stock by Bragg Development Company and Bragg Investment Company in the years 1951 and 1953 resulted in ordinary income to the petitioner-shareholders, pursuant to the provisions of section 117(m) of the Internal Revenue Code of 1939; whether payments made to petitioners as "salaries" pursuant to the terms of a partnership agreement are taxable in full to them; and whether various taxes paid by two partnerships are deductible in computing partnership net income. Other issues are whether a $16,000 debt owing to petitioner Bryan became worthless in the calendar year 1951; whether petitioner McNairy was taxable upon $12,234.18 unreported commission income in the year 1951; whether additions to tax under section 294(d)(1)(A) were properly determined as to the petitioners for each of the years 1951 to 1953, inclusive; and whether the respondent properly determined an addition to tax against the Bryans under section 294(d)(2) for the year 1952.

In Docket No. 61626 the petitioners concede that respondent correctly disallowed deductions relating to farm expenses for the years 1951 and 1952, and the petitioners in Docket No. 61627 concede that respondent correctly disallowed a casualty loss for 1953. In both dockets the respondent has conceded error in increasing bond premium income for 1951 and 1952 and in decreasing bond premium income for 1953. He also concedes that the petitioners in Docket No. 61627 paid the claimed medical expenses in 1953 and that the amount thereof which is deductible is merely a matter of computation. All these matters will be taken into consideration in the computation under Rule 50. In both dockets the respondent concedes on brief that he failed to carry the burden of proof in respect to an issue involving section 112(k) for the year 1953, which was raised by amendments to his answers.

FINDINGS OF FACT.

Some of the facts are stipulated and the stipulations are incorporated herein by this reference.

The petitioners, R. A. Bryan and Ruby M. Bryan, are husband and wife, residing in Goldsboro, North Carolina. R. A. Bryan will be hereinafter referred to as Bryan. They filed their joint income tax

returns for the years 1951 to 1953, inclusive, with the collector of internal revenue at Greensboro, North Carolina.

The petitioners, C. B. McNairy and Rowena A. McNairy are husband and wife, residing at Goldsboro, North Carolina. C. B. McNairy will be hereafter referred to as McNairy. They filed their joint income tax returns for the years 1951 to 1953, inclusive, with the collector of internal revenue at Greensboro, North Carolina.

## Facts as to Collapsible Corporation Issue.

In 1949 the petitioners, R. A. Bryan and C. B. McNairy, together with three other individuals owned a corporation, T. A. Loving & Co., which was engaged in the construction business. At that time W. H. Weaver and his wife owned another construction corporation, W. H. Weaver Construction Co., Inc.

Sometime in 1949 the United States military authorities at Fort Bragg, North Carolina, issued an invitation to bid for the construction, financing, and management by private enterprise of 1,000 family housing units on land forming a part of the Fort Bragg Military Reservation. These units were to be constructed primarily for use by military and Government civilian personnel, and the rental rates to be charged were to be within specified limits. The successful bidder was to manage the housing development project and receive a lease for a term of 75 years, the annual rental to be $3 per acre. This construction was to be financed by insured mortgages under the provisions of Pub. L. 211, 81st Cong., 1st Sess., approved August 8, 1949, which added Title VIII to the National Housing Act, which title is popularly known as the Wherry Act.

The two corporations above mentioned, T. A. Loving & Co., and W. H. Weaver Construction Co., formed a joint venture known as Loving-Weaver for the purpose of bidding on this construction. Each corporation owned a 50 per cent interest in the joint venture. The joint venture was the successful bidder.

For the purpose of carrying out the project the Bryan-McNairy interests and the Weaver interests caused two corporations to be organized under the laws of North Carolina on or about March 15, 1950. These were Bragg Investment Co., Inc., hereinafter referred to as Investment, and Bragg Development Co., Inc., hereinafter referred to as Development. The Federal Housing Administration required that two corporations be formed, instead of one, to carry out the initial proposal for constructing the 1,000 units, because of the size of the proposed FHA-insured loans. Each of these corporations kept its books and filed its income tax returns on an accrual method and on the basis of a fiscal year ending the last day of February.

The charter of each of the corporations stated that the object for which it was formed was to provide housing for rent or sale, to im-

prove and operate, and to sell, convey, assign, mortgage, or lease any real estate and any personal property. Each charter provided that so long as any property of the corporation was encumbered by a mortgage or deed of trust insured by the Federal Housing Commissioner it should not engage in any business other than the construction and operation of a rental housing project or projects.

In the case of each corporation the authorized capital stock consisted of 100,000 shares of class A common stock having a par value of $1 per share, 3,999 shares of class B common stock having a par value of $100 per share, and 100 shares of preferred stock having a par value of $1 per share.

Under the certificate of incorporation the preferred stock carried the right to noncumulative dividends at 5 cents per share before any dividend or distribution upon the common stock, the class B stock was entitled to noncumulative dividends of 6 per cent out of current net earnings before payment of any dividends on the class A stock and had priority, upon dissolution, over the class A stock. The class B common stock could be retired at $100 per share after the payment of all interest and principal due and after making provision for payment of operating expenses, etc., and after the establishment of a reserve fund for replacements. The original charter provided that no such stock could be retired until after the completion of the improvements on the property, or before the final endorsement for mortgage insurance by the Federal Housing Commissioner. The class A common stock had the exclusive voting privilege, except in the case of specified defaults, in which case the preferred stock had the right to elect directors. Upon liquidation the class A common stock was entitled to the entire assets after the payment of the preferred stock and the class B common stock.

Each certificate of incorporation also provided that the preferred stock might be retired and should be retired upon, but in no event before, the termination of any contract of mortgage insurance covering any indebtedness to which the FHA was a party. It was also provided that the corporation should not, without approval of the holders of the majority of the shares of the preferred stock, assign, transfer, dispose of, or encumber any real or personal property, including rents, except as permitted by the terms of the mortgage, and should not consolidate or merge with any other corporation, go into voluntary liquidation, effect any plan of reorganization, redeem or cancel any of its shares of preferred stock, or amend the certificate of incorporation.

Each corporate charter was amended on or about October 23, 1951, to provide *inter alia* that the class B common stock could be redeemed only with funds representing earned or donated surplus and only after receipt of written approval of the holder of the majority of the shares of preferred stock, after submission of financial statements and satis-

factory evidence that no default existed and that redemption would not jeopardize the interest of the mortgage holder or the insurer. It was further provided that any stock so redeemed should be retired and canceled.

Investment and Development each issued its preferred and class A common capital stock for cash at $1 par value per share, on April 17, 1950, as follows:

| Type of stock | Number of shares | Name in which issued |
|---|---|---|
| Preferred | 100 | Federal Housing Administration |
| A common | 10 | C. B. McNairy |
| A common | 120 | W. H. Weaver |
| A common | 30 | Edith H. Weaver |
| A common | 25 | C. B. McNairy, III |
| A common | 25 | Rowena A. McNairy, Trustee |
| A common | 65 | Ruby M. Bryan, Trustee |
| A common | 25 | R. A. Bryan |

Each corporation had the same officers, namely, W. H. Weaver, president, R. A. Bryan, vice president, C. B. McNairy, secretary-treasurer, and Edith H. Weaver, assistant secretary-treasurer.

Prior to the incorporation of Investment and Development, the McNairy and Weaver interests had arranged for the services of an architect, Seward H. Mott. The FHA required that contracts with architects be in writing and on April 17, 1950, written contracts were executed between Mott and Development and Investment. Those contracts provided that Mott was to receive $2,000 in cash from each of those corporations and was to receive 2,023.71 shares of class B common stock, par value $100 per share, of Investment, and 2,189.53 shares of class B common stock, par value $100 per share, of Development.

On April 17, 1950, Investment issued stock certificate No. 1 in the name of Seward H. Mott for 2,023.71 shares of its class B common stock. Mott immediately endorsed the certificate, which was canceled or retired, and Investment reissued the shares represented thereby as follows:

*Shares*
Certificate No. 2—W. H. Weaver_____ 1, 011. 855
Certificate No. 3—Ruby M. Bryan_____ 607. 113
Certificate No. 4—C. B. McNairy_____ 404. 742

On April 17, 1950, Development issued stock certificate No. 1 in the name of Mott, representing 2,189.53 shares of its class B common stock. This certificate was also immediately endorsed by Mott and was canceled or retired and Development reissued the same as follows:

*Shares*
Certificate No. 2—W. H. Weaver_____ 1, 094. 765
Certificate No. 3—Ruby M. Bryan_____ 656. 859
Certificate No. 4—C. B. McNairy_____ 437. 906

(Shares represented by certificate No. 4 were reissued to Rowena A. McNairy on March 1, 1951, by certificate No. 5.)

The actual consideration which Mott was to receive had been fixed prior to the incorporation of Investment and Development. Prior to April 17, 1950, he had received $20,960. The total amount paid to Mott was $28,010 by checks as follows:

| | |
|---|---:|
| Bragg Investment Company, Inc | $2,000 |
| Bragg Development Company, Inc | 2,000 |
| W. H. Weaver | 12,005 |
| Ruby M. Bryan | 7,203 |
| C. B. McNairy | 4,802 |
| Total | 28,010 |

Each corporation and the Secretary of the Army entered into an agreement entitled "LEASE FOR PRIVATE HOUSING TO BE INSURED UNDER TITLE VIII, NATIONAL HOUSING ACT." The corporation was granted a lease of the land for 75 years at a rental of $3 per acre, in consideration for its various undertakings, the land to be used for the purpose of erecting, maintaining, and operating a housing project consisting of 500 units in accordance with plans and specifications theretofore submitted and to be approved by the Federal Housing Commissioner. The agreement contained detailed provisions as to the classes to whom the various units might be rented and as to the rental to be charged. It was provided that title to all improvements constructed upon the leased premises by the lessee should, during the term of the lease, remain in the lessee. Upon expiration of the lease, or earlier termination, all improvements were to become the property of the United States Government without compensation, unless the lessee should elect to remove the improvements and restore the premises. It was further provided that the agreement should be binding upon and inure to the benefit of the Government, its assigns, and the lessee and its successors and assigns. It was also provided that the lessee should neither transfer nor assign the lease without the prior written approval of the district engineer.

In 1949 an application (Project No. 053–80001) on behalf of Investment was filed with the FHA to insure a loan in the amount of $4,050,000. Commitment was obtained on April 19, 1950, based upon the FHA estimate of replacement cost of $4,505,932, which included an item of architect fees of $204,371, which was the amount of the par value of the class B common stock which had been issued to Mott, plus $2,000. Thereafter Investment procured an insured loan in the amount of $4,050,000 and contracted with the joint venture, Loving-Weaver, for the construction of the military housing project at a price of $3,840,350. Construction on the project was commenced on or about April 18, 1950, and was completed on or about March 26, 1951. Final approval by endorsement of the FHA loan guarantee was made on May 2, 1951. Units in the project were first rented on or about No-

vember 15, 1950. The dates the completed units became available for occupancy, the available units occupied, and the monthly rentals applicable to the available units were as follows:

| Date | Completed units available for occupancy | Available units occupied | Applicable monthly rental |
| --- | --- | --- | --- |
| Nov. 30, 1950 | 70 | 70 | $5, 119 |
| Dec. 30, 1950 | 202 | 202 | 14, 890 |
| Jan. 30, 1951 | 274 | 274 | 20, 254 |
| Feb. 28, 1951 | 376 | 376 | 28, 832 |
| Mar. 30, 1951 | 500 | 500 | 39, 447 |

In 1949 an application (Project No. 053–80002) on behalf of Development was filed with the FHA to insure a loan in the amount of $4,373,000. Commitment was obtained on April 19, 1950, upon the FHA estimate of replacement cost of $4,869,325, which included an item of architect fees of $220,953, which was the amount of the par value of the class B common stock which had been issued to Mott, plus $2,000. Thereafter Development procured an insured loan in the amount of $4,373,000 and contracted with the joint venture, Loving-Weaver, for the construction of the housing project at a price of $4,148,191. Construction on the project was commenced on or about April 18, 1950, and was completed on or about May 25, 1951. Final approval by endorsement of the FHA loan guarantee was made on August 10, 1951. Units in the project were first rented on or about August 15, 1950. The dates the completed units became available for occupancy, the available units occupied, and the monthly rentals applicable to the available units were as follows:

| Date | Completed units available for occupancy | Available units occupied | Applicable monthly rental |
| --- | --- | --- | --- |
| Aug. 16, 1950 | 36 | 36 | $2, 646 |
| Sept. 30, 1950 | 168 | 168 | 12, 375 |
| Oct. 30, 1950 | 245 | 245 | 18, 055 |
| Nov. 30, 1950 | 265 | 265 | 19, 548 |
| Dec. 30, 1950 | 315 | 315 | 23, 310 |
| Jan. 30, 1951 | 329 | 329 | 24, 430 |
| Feb. 28, 1951 | 337 | 337 | 25, 110 |
| Mar. 30, 1951 | 337 | 337 | 25, 110 |
| Apr. 30, 1951 | 450 | 450 | 34, 915 |
| May 25, 1951 | 500 | 500 | 39, 485 |

The FHA project analyses contemplated occupancy at 93 per cent; estimated annual gross income of $440,541 from Investment's project and $466,911 from Development's project; and estimated annual net income, after operating expenses and taxes, of $284,506 on the Investment project and $307,232 on the Development project.

The corporate charters, in accordance with FHA requirements, required that cash reserves for replacement be deposited with

the mortgagee, in addition to the payment of amortization and insurance. The required yearly reserve deposits were estimated at $24,742 for Investment and $26,442 for Development, and monthly deposits based thereon were made.

On August 20, 1951, joint meetings of the stockholders and directors of Investment and Development were held [1] and pursuant to resolutions adopted, all the class B common stock then outstanding was retired at par, the corporations issuing therefor checks dated August 31, 1951, as follows:

|  | Investment | Development |
|---|---|---|
| W. H. Weaver | $101,185.50 | $109,476.50 |
| Ruby M. Bryan | 60,711.30 | 65,685.90 |
| C. B. McNairy | 40,474.20 | 43,790.60 |
| Total | 202,371.00 | 218,953.00 |

In their joint income tax return for the year 1951 the McNairys reported long-term capital gain of $39,222.20 upon the redemption of 404.742 shares of class B common stock of Investment and long-term capital gain of $40,240.60 on the redemption of 437.906 shares of class B common stock of Development.

In their joint income tax return for the year 1951 the Bryans reported long-term capital gain of $58,833.30 upon the redemption of 607.113 shares of class B common stock of Investment and long-term capital gain of $60,360.90 upon the redemption of 656.859 shares of class B common stock of Development.

In computing their capital gain, the individuals allocated $24,010 of the payments which had theretofore been made to Mott as cost of class B common stock as follows:

|  | Investment | Development | Total |
|---|---|---|---|
| W. H. Weaver | $5,766 | $6,239 | $12,005 |
| Rowena A. McNairy or C. B. McNairy | 1,252 | 3,550 | 4,802 |
| Ruby M. Bryan | 1,878 | 5,325 | 7,203 |
| Total | 8,896 | 15,114 | 24,010 |

[1] The minutes of each such meeting contain the following: "The president announced that the corporation had completed the building operation on the lands of the corporation at Fort Bragg, Cumberland County, North Carolina, and that it was evident that the corporation would have in its hands at the end of the next semi-annual fiscal period, to-wit: August 31, 1951, after the payment of, or segregation of, funds for the payment of all building expenses, taxes, assessments, fees and charges, whether due or accrued, and after the payment of all interest and principal and deposits for taxes, assessments, water rent, mortgage insurance premium and hazard insurance premiums, all as required by the terms of the mortgage executed by this corporation to T. C. Hoyle, Jr., Trustee, and insured by Federal Housing Administration and after the establishment and maintenance of a reserve fund for replacements as called for in paragraph 4(g) of the Certificate of Incorporation a sufficient sum of money to retire all of its Class B Common Stock; that the note executed by this corporation to Security National Bank of Greensboro has been fully disbursed and has secured final endorsement; that the corporation has no productive use for the funds; that it would be to the best interests of the Common Stock holders and of the corporation that the Class B Common Stock be retired on August 31, 1951, which is the end of the semi-annual fiscal period of the corporation."

In determining deficiencies against the Bryans and McNairys for the year 1951, the respondent held that the full amount received from the redemption of the class B common stock of Development (amounting to $65,685.90 in the case of the Bryans and $43,790.60 in the case of the McNairys) and the full amount received upon redemption of the class B common stock of Investment (amounting to $60,711.30 in the case of the Bryans and $40,474.20 in the case of the McNairys) constituted ordinary income within the provisions of section 22(a) and section 117(m) of the Internal Revenue Code of 1939.

At some time in 1951 the military authorities at Fort Bragg negotiated with Investment and Development for the construction of an additional 1,000 units similar to those described above. As in the case of the first two projects, 500 units were to be built by each of these corporations. The provisions of the agreements were essentially the same as with regard to the prior projects.

In 1951 an application (Project No. 053–80008) on behalf of Investment was filed with the FHA to insure a loan in the amount of $4,214,000, based upon an FHA estimate of replacement cost of $4,683,694, which included an item of architect fees of $212,595, which was the amount of the par value of the additional class B common stock issued to Mott, plus $2,000, referred to *infra*. Commitment was obtained on June 29, 1951. Thereafter Investment procured an insured loan in the amount of $4,214,000 and contracted with the joint venture, Loving-Weaver, for construction of the project at a price of $3,976,228. Construction was commenced on or about October 9, 1951, and was completed on or about November 4, 1952. Final approval by endorsement of the FHA loan guarantee was made on November 19, 1952. Units in the project were first rented on or about March 24, 1952. The dates the completed units became available for occupancy, the available units occupied, and the monthly rentals applicable to the available units were as follows:

| Date | Completed units available for occupancy | Available units occupied | Applicable monthly rental |
|---|---|---|---|
| Mar. 24, 1952 | 60 | | $4,405 |
| Apr. 30, 1952 | 142 | 142 | 10,343 |
| May 30, 1952 | 156 | 145 | 11,360 |
| June 30, 1952 | 156 | 133 | 11,360 |
| July 30, 1952 | 244 | 242 | 17,831 |
| Aug. 30, 1952 | 329 | 326 | 24,432 |
| Sept. 30, 1952 | 383 | 383 | 28,942 |
| Oct. 30, 1952 | 476 | 456 | 37,382 |
| Nov. 30, 1952 | 500 | 495 | 39,447 |

In 1951 an application (Project No. 053–80009) on behalf of Development was filed with the FHA to insure a loan in the amount of $4,050,000. Commitment in that amount was obtained on June 29,

1951, based upon an FHA estimate of replacement cost of $4,507,326, which included an item for architect fees of $204,437, which is the par value of the additional class B common stock issued to Mott, plus $2,000, referred to *infra*. Thereafter Development obtained an insured loan in the amount of the commitment and contracted with Loving-Weaver for construction of the project at a price of $3,820,100. Construction commenced on or about October 9, 1951, and was completed on or about January 23, 1953. Final approval by endorsement of the FHA loan guarantee was made on January 28, 1953. Units in the project were first rented on or about April 3, 1952. The dates the completed units became available for occupancy, the available units occupied, and the monthly rentals applicable to the available units were as follows:

| Date | Completed units available for occupancy | Available units occupied | Applicable monthly rental |
|---|---|---|---|
| Apr. 30, 1952 | 48 | | $3,574 |
| May 30, 1952 | 90 | 53 | 6,659 |
| June 30, 1952 | 217 | 211 | 15,996 |
| July 30, 1952 | 300 | 300 | 22,155 |
| Aug. 30, 1952 | 300 | 300 | 22,155 |
| Sept. 30, 1952 | 300 | 299 | 22,155 |
| Oct. 30, 1952 | 300 | 300 | 22,155 |
| Nov. 30, 1952 | 356 | 327 | 27,260 |
| Dec. 30, 1952 | 453 | 363 | 35,145 |
| Jan. 23, 1953 | 500 | 409 | 39,450 |

Here again, as in the case of the first two projects, the FHA project analyses contemplated occupancy at 93 per cent; estimated annual gross income of $440,541 from each of the projects; and estimated annual net income, after operating expenses and taxes, of $284,506 on each of the Investment and Development projects. Deposits with the mortgagee for replacement reserves were made monthly by Investment and Development based upon an estimate of $24,742 per year.

Under date of October 8, 1951, Investment issued 566.69 shares of class B common stock to W. H. Weaver Construction Co. and a like amount to T. A. Loving & Co. On the same date Development issued 572.185 shares of class B common stock to W. H. Weaver Construction Co. and a like amount to T. A. Loving & Co. All these shares were issued by each corporation for cash at par value to provide cash to be used for construction of the second 1,000 units. This stock was retired at par on March 2, 1953.

On October 8, 1951, written contracts were negotiated between the two corporations and the architect, Mott, according to the provisions of which Mott was to receive from each corporation $2,000 in cash. In addition it was provided that he should receive 2,105.95 shares of class B common stock of Investment and 2,024.37 shares of class B common stock of Development.

On October 25, 1951, Investment issued in the name of Mott 2,105.95 shares of class B common stock. Mott immediately endorsed the certificate which was canceled or retired, and on November 13, 1951, Investment reissued the shares as follows:

|  | Shares |
|---|---|
| Certificate No. 9—Edith H. Weaver | 1, 052. 975 |
| Certificate No. 10—Ruby M. Bryan | 631. 785 |
| Certificate No. 11—Rowena A. McNairy | 421. 190 |

On October 25, 1951, Development issued in the name of Mott 2,024.37 shares of class B common stock. He immediately endorsed the certificate which was canceled or retired, and on November 13, 1951, Development reissued the shares as follows:

|  | Shares |
|---|---|
| Certificate No. 10—Edith H. Weaver | 1, 012. 185 |
| Certificate No. 11—Ruby M. Bryan | 607. 311 |
| Certificate No. 12—Rowena A. McNairy | 404. 874 |

Mott was paid $24,595.62 in cash as follows:

|  |  |
|---|---|
| Bragg Investment Company, Inc | $2, 000. 00 |
| Bragg Development Company, Inc | 2, 000. 00 |
| Edith H. Weaver | 10, 297. 82 |
| Ruby M. Bryan | 6, 178. 68 |
| Rowena A. McNairy | 4, 119. 12 |
| Total | 24, 595. 62 |

Here again, as in the case of the first two projects, Mott had agreed with the two corporations and the petitioners upon the above total as the fee he was to receive. In each instance the agreement was made prior to the filing by each corporation with the FHA of its application for mortgage insurance.

On August 31, 1953, special meetings of the directors and the stockholders of the two corporations, Investment and Development, were held. Pursuant to resolutions adopted at such meetings with reference to retirement of 1,049.74 shares of class B common stock of Investment and 920.70 shares of class B common stock of Development, checks were issued by each corporation dated September 21, 1953, as follows:

| Name | Checks issued by Investment | Checks issued by Development |
|---|---|---|
| Edith H. Weaver | $52, 487 | $46, 035 |
| Ruby M. Bryan | 31, 492 | 27, 621 |
| Rowena A. McNairy | 20, 995 | 18, 414 |
| Total | 104, 974 | 92, 070 |

Prior to redeeming the class B common stock, Investment and Development had requested permission of the FHA for such redemp-

tion. The letter of the FHA in response thereto is set forth substantially in full in the margin.[2]

In their joint income tax return for the year 1953 the McNairys reported long-term capital gain in the amount of $19,944.88 from the redemption of the class B common stock of Investment. They also reported long-term capital gain of $17,404.56 from the redemption of the class B common stock of Development.

In their joint income tax return for the year 1953 the Bryans reported long-term capital gain of $29,916.82 from the redemption of the class B common stock of Investment and long-term capital gain of $26,106.84 from the redemption of the class B common stock of Development.

In computing their capital gain the individuals allocated $20,595.62 of the payments which had theretofore been paid to Mott as cost of the class B common stock as follows:

| Name | Investment | Development | Total |
|------|-----------|-------------|-------|
| Edith H. Weaver | $5,250.61 | $5,047.21 | $10,297.82 |
| Ruby M. Bryan | 3,150.36 | 3,028.32 | 6,178.68 |
| Rowena A. McNairy | 2,100.24 | 2,018.88 | 4,119.12 |
| Total | 10,501.21 | 10,094.41 | 20,595.62 |

In determining deficiencies against the Bryans and McNairys for the year 1953, the respondent held that the full amount received upon redemption of the class B common stock of Investment (amounting to $31,492 in the case of the Bryans and $20,995 in the case of the Mc-Nairys) and the full amount received upon redemption of the class B common stock of Development (amounting to $27,621 in the case of the Bryans and $18,414 in the case of the McNairys) constituted ordinary income within the provisions of section 22(a) and section 117(m) of the Internal Revenue Code of 1939.

---

[2] "Your requests for the permission of this Administration for the redemption of Class B common stock in the above identified corporations have been forwarded to us by Mr. James P. McRae, our Director in Greensboro, North Carolina. The requests were for the redemption of stock having a par value of $323,933.00 by the Bragg Investment Company, Inc., and stock with a par value of $316,873.00 by the Bragg Development Company, Inc.

"The redemption provisions of the respective Corporate Charters provide that such stock may be redeemed only with funds representing earned or donated surplus and our Comptroller advises that the maximum permitted by the charter of Bragg Investment Company, Inc., is $218,313.71. The amount is $206,507.43 in the case of Bragg Development Company, Inc.

"This Administration will offer no objection to redemption of stock in the above amounts, subject to the following condition: Inasmuch as liability for the payment of real estate taxes has not been finally determined and in view of the fact that these corporations may become liable for the payment of such taxes the mortgagor corporations shall deposit with the mortgagees funds sufficient to pay the estimated present liability and shall also agree to deposit with the mortgagees monthly, amounts necessary to accumulate in the hands of the mortgagees or their designated agents funds estimated to be sufficient to liquidate the entire tax liability when and if such taxes become due."

The par value of the class B common stock of each of the corporations, Investment and Development, which had been issued to Mott in connection with each of the projects was capitalized and charged on the books of each corporation as part of construction cost.  However, the corporations excluded from their bases for depreciation of the buildings the difference between the par value of the stock issued to Mott and the amounts paid Mott by the individual stockholders.

The income tax returns of Investment showed rental receipts and net income as follows:

| Fiscal year ended | Rents | Net income (or loss) |
|---|---|---|
| Feb. 28, 1951 | $53, 464. 57 | ($110, 535. 12) |
| Feb. 29, 1952 | 463, 675. 51 | 21, 403. 06 |
| Feb. 28, 1953 | 729, 611. 82 | (10, 748. 13) |
| Feb. 28, 1954 | 896, 541. 39 | (40, 276. 45) |

The income tax returns of Development showed rental receipts and net income as follows:

| Fiscal year ended | Rents | Net income (or loss) |
|---|---|---|
| Feb. 28, 1951 | $117, 046. 80 | ($58, 069. 66) |
| Feb. 29, 1952 | 460, 041. 23 | 11, 927. 31 |
| Feb. 28, 1953 | 697, 845. 96 | (51, 045. 00) |
| Feb. 28, 1954 | 929, 145. 04 | (19, 854. 82) |

The United States Government, pursuant to the power of eminent domain, acquired all right, title, and interest held by the two corporations, Investment and Development, by virtue of the lease contracts hereinabove described, by the filing with the United States District Court for the Eastern District of North Carolina, on November 1, 1957, of a "DECLARATION OF TAKING." The United States deposited with the court an amount of $780,000 as being just compensation.  At the time of the trial in the instant case the matter of just compensation had not been completely settled.

Investment and Development were formed or availed of principally for the construction of properties with a view to the realization by their shareholders of gain attributable to the properties through distributions to the shareholders or sales or exchanges of stock by the shareholders, before the realization by the corporations of substantial parts of the net income to be derived from the properties.

*Facts Relating to "Salaries" Paid by Fayetteville Building Company.*

On November 1, 1951, Joe W. Stout, Florence L. Rogers, Terry A. Lyon, C. B. McNairy, and Raymond A. Bryan formed a partnership under the name of Fayetteville Building Company, to engage in the business of dealing in real estate and building houses, apartment houses, etc.  The partnership agreement provides in part as follows:

6. The net profits of the partnership shall be divided and the net losses of the partnership shall be borne in the following proportions:

|  | Per cent |
|---|---|
| Florence L. Rogers | 30 |
| Terry A. Lyon | 10 |
| Joseph Stout | 20 |
| C. B. McNairy | 20 |
| Raymond Bryan | 20 |

\*    \*    \*    \*    \*    \*    \*

8. It shall be the special duty and obligation of Joseph Stout, C. B. McNairy and Raymond Bryan to plan and supervise all construction work done by the partnership. Such work shall be supervised and managed in detail by Joseph Stout and by this agreement, he undertakes to give to such supervision and management all the time reasonably required according to the work on hand. Accordingly, salaries shall be fixed and paid as follows:

(a) Joseph Stout, for the services described above, shall be entitled to a salary equivalent to an amount which equals five per cent (5%) of the actual cost of all construction work performed by the partnership.

(b) Messrs. McNairy and Bryan, for the services described above, each shall be entitled to a salary equivalent to an amount which equals two and one-half per cent (2½%) of the actual cost of all construction work performed by the partnership.

(c) Florence L. Rogers and Terry A. Lyon shall receive no salaries.

9. All the above mentioned salaries shall be deducted from the net profits of the partnership as an expense thereof in determining the partners' distributive shares of the net profit of the partnership. If during any year the salary paid shall exceed the net income of the partnership, computed without the deduction of such salaries, the excess shall be treated as a loss of the partnership to be borne by the partners in the proportions stated in paragraph 6 of this agreement.

\*    \*    \*    \*    \*    \*    \*

19. By mutual consent of all partners the partnership may be dissolved at any time. All funds and assets of the partnership after the debts are paid shall be divided among the partners in the proportions provided for by paragraph 6 of this agreement.

At the time of the organization of Fayetteville Building Company the several partners contributed capital to the partnership in amounts as follows:

| Partner | Amount | Partner | Amount |
|---|---|---|---|
| Florence L. Rogers | $750 | C. B. McNairy | $500 |
| Terry A. Lyon | 250 | Raymond A. Bryan | 500 |
| Joe W. Stout | 500 | | |

On November 24, 1951, the partnership acquired a tract of land consisting of 22.65 acres, located between Fayetteville and Fort Bragg, North Carolina, from Florence L. Rogers for $5,600 and built thereon a group of rental housing units known as "Eutaw Apartments." To finance this construction the partnership borrowed the amount of $1,075,700 from a bank. The housing units were 53 per cent complete on the last day of February 1952. They were completed on June 30.

1952. The first occupancy was in April 1952. By July 1, 1952, the entire project was rented. Upon completion of construction of the two projects, the cost of the land and improvements thereto was capitalized on the books of the partnership. The amounts capitalized did not include the partners' salaries or the taxes paid and hereinafter referred to.

The partnership used an accrual method in keeping its books of account and filing its tax returns, and it employed a fiscal year ending on August 31.

Pursuant to paragraph 8 of the partnership agreement, the partnership during its fiscal year November 1, 1951, to August 31, 1952, paid salaries to Stout, McNairy, and Bryan in amounts as follows:

| Name | Amount |
|---|---|
| Joe W. Stout | $49,674.98 |
| C. B. McNairy | 24,837.49 |
| Raymond A. Bryan | 24,837.49 |
| Total | 99,349.96 |

On its books of account for the fiscal year ended August 31, 1952, the partnership treated as an expense the aforementioned salaries in the total amount of $99,349.96, and the resulting net loss of $114,692.53 per books was allocated among the partners on the partnership books of account as follows:

| Partner | Amount | Percentage of net loss |
|---|---|---|
| Florence L. Rogers | $34,407.75 | 30 |
| Terry A. Lyon | 11,469.25 | 10 |
| Joe W. Stout | 22,938.51 | 20 |
| Raymond A. Bryan | 22,938.51 | 20 |
| C. B. McNairy | 22,938.51 | 20 |

In its income tax return for the fiscal year ended August 31, 1952, the partnership reported a net loss of $15,342.57. In computing such net loss the salary payments to Stout, McNairy, and Bryan in the respective amounts of $49,674.98, $24,837.49, and $24,837.49 were not deducted as expenses, but were treated as withdrawals by them, and the return contains the following "Reconciliation of Partners' Capital Accounts":

| | Capital acct. at beginning of year | Partners' shares of ordinary net income | Withdrawals | Capital acct. at end of year |
|---|---|---|---|---|
| Rogers | $750 | ($34,407.75) | | ($33,657.75) |
| Lyon | 250 | (11,469.25) | | (11,219.25) |
| Stout | 500 | 26,736.47 | $49,674.98 | (22,438.51) |
| Bryan | 500 | 1,898.98 | 24,837.49 | (22,438.51) |
| McNairy | 500 | 1,898.98 | 24,837.49 | (22,438.51) |
| Total | 2,500 | (15,342.57) | 99,349.96 | (112,192.53) |

In his return for the year 1952 Bryan and McNairy each reported income from the partnership in the amount of $1,898.98.

In connection with the determination of deficiencies against the McNairys and the Bryans for the year 1952, the respondent, as a result of certain adjustments, including the disallowance of certain deductions for taxes paid, later discussed herein, determined that the partnership for its fiscal year ended August 31, 1952, had ordinary net income of $561.01. In the case of Bryan and McNairy he determined that the correct distributive share of partnership net income of each was $112.20, instead of $1,898.98 which they reported, and accordingly decreased taxable income by the difference of $1,786.78. He determined, however, that the amount of $24,837.49 was ordinary income to each of them under section 22(a) of the Internal Revenue Code of 1939, as compensation for personal services rendered.

In such notices of deficiency the respondent determined that the salaries of $99,349.96 constituted a part of the cost of construction of the rental housing units. He accordingly capitalized such amount and allowed additional depreciation in computing the net income of the partnership.

The partnership reported a net loss of $24,634.28 for the fiscal year ended August 31, 1953. The respondent determined that the partnership had a net loss for that year in the amount of $10,450.92.

*Facts as to Deductibility of Taxes by Fayetteville Building Co.*

In the fiscal years ended August 31, 1952 and 1953, the partnership claimed various deductions, including taxes in amounts as follows:

|  | 1952 | 1953 |
|---|---|---|
| North Carolina sales tax | $11,351.10 | $10,431.47 |
| North Carolina use tax | 0 | 1,216.86 |
| Social security tax (FICA) | 2,471.09 | 3,164.81 |
| Federal unemployment tax | 496.05 | 0 |
| North Carolina unemployment tax | 165.35 | 0 |
| Total | 14,483.59 | 14,813.14 |

In the notice of deficiency the respondent allowed the partnership a deduction for the taxes in amounts as follows:

|  | 1952 | 1953 |
|---|---|---|
| North Carolina sales tax | 0 | 0 |
| North Carolina use tax | 0 | 0 |
| Social security tax (FICA) | $47.90 | $78 |
| Federal unemployment tax | 3.19 | 0 |
| North Carolina unemployment tax | 9.58 | 0 |
| Total | 60.67 | 78 |

The respondent disallowed the balance of the deductions claimed by the partnership for taxes upon the ground that the amounts disallowed

were capital expenditures; he allowed additional depreciation on account thereof. The taxes disallowed by the respondent were paid by the partnership in connection with the construction of two housing projects as follows:

| | Aug. 31, 1952, Eutaw Apartments | | Aug. 31, 1953, 2d housing project | |
|---|---|---|---|---|
| | N.C. sales and use tax | FICA and unemployment tax | Sales tax | FICA tax |
| Land improvements | $863.13 | $306.09 | $747.73 | $201.90 |
| Buildings | 7,798.84 | 2,765.73 | 9,802.49 | 2,646.80 |
| Furnaces | 709.89 | ----------- | 449.91 | 76.59 |
| Oil tanks | 192.67 | ----------- | 55.87 | 15.09 |
| Ranges | 537.44 | ----------- | 190.49 | 51.43 |
| Refrigerators | 698.93 | ----------- | 240.17 | 64.85 |
| Water heaters | 404.17 | ----------- | 111.67 | 30.15 |
| Venetian blinds | 146.03 | ----------- | ----------- | ----------- |
| | 11,351.10 | 3,071.82 | 11,648.33 | 3,086.81 |
| | | 11,351.10 | | 11,648.33 |
| | | 14,422.92 | | 14,735.14 |

*Facts as to Deductibility of Taxes by Onslow Building Company.*

A partnership known as Onslow Building Company in which the petitioners, R. A. Bryan and C. B. McNairy, had a 31 per cent interest and a 20 per cent interest, respectively, in the profits or losses, kept its books and accounts and filed its tax returns on an accrual method for the fiscal years ended October 31, 1952 and 1953.

In its income tax returns filed for those fiscal years, the partnership claimed deductions for certain taxes as follows:

| | Year ended Oct. 31 | |
|---|---|---|
| | *1952* | *1953* |
| North Carolina sales tax | $9,762.25 | $2,892.88 |
| Social security tax (FICA) | 3,762.04 | ---------- |
| North Carolina unemployment tax | 6,724.32 | ---------- |
| Federal unemployment tax | 747.15 | ---------- |
| Property tax | ---------- | 12,945.10 |
| North Carolina intangible tax | ---------- | 243.74 |
| Payroll taxes | ---------- | 2,282.35 |
| Total | 20,995.76 | 18,364.07 |

In the statutory notice of deficiency the respondent disallowed all the aforesaid amounts claimed for the fiscal year ended October 31, 1952, except $7.81, consisting of FICA taxes of $2.60, North Carolina unemployment tax of $4.69, and Federal unemployment tax of 52 cents. Respondent also disallowed the following amounts claimed with respect to the fiscal year ended October 31, 1953:

North Carolina sales tax_____ $2, 882. 88
Payroll taxes_____ 2, 025. 70

Total_____ 4, 908. 58

The aforesaid taxes for both years were disallowed upon the ground that they were capital expenditures. All of said taxes disallowed by the respondent were paid by Onslow Building Company in connection with the construction by the partnership of two housing projects being constructed for rental purposes. The sales tax was paid on materials and supplies used in the construction of the projects and the payroll taxes were paid upon wages of employees directly engaged in the construction of the projects. The partnership did not capitalize any of the taxes above referred to. The respondent allowed additional depreciation on account of the taxes which he held were properly to be capitalized.

### Bryan Loan.

G. B. Bagley, who was in the beer distributing business, was indebted to a bank on a note or notes on which the petitioner R. A. Bryan was endorser. Bryan was also a director of this bank. Bagley was a friend of Bryan but had no business connection with him. The bank insisted that the loan or loans be repaid upon maturity. R. A. Bryan, not having sufficient funds, requested his wife, the petitioner Ruby M. Bryan, to pay off the obligations. This she did by making loans to Bagley in the amounts of $3,500 in April 1951 and $12,500 in September 1951, these loans being evidenced by promissory notes signed by Bagley and endorsed by the petitioner R. A. Bryan. At some later time there was substituted by Bagley a single note to Ruby M. Bryan in the amount of $16,000.

Bagley remained in the beer distributing business throughout the year 1951. During that year he did not make any payments on the note nor did he pay interest. During 1951 no action was taken by the Bryans toward collecting the note. No amount had been collected by the Bryans on the note up to the time of the hearing of this case.

### Commissions to McNairy From Loving-Weaver.

On December 29, 1950, McNairy, as secretary-treasurer of the joint venture, Loving-Weaver, issued a check to himself in the amount of $22,940.35, which he deposited in his personal bank account on December 30, 1950. McNairy included this amount in income reported in his joint income tax return for 1950. In 1951 he received no commission from this source and included in his return for 1951 no amount as commissions from Loving-Weaver. In the notice of deficiency for the year 1951, the respondent included an amount of $12,234.18 as commission from Loving-Weaver, with the following explanation:

It has been determined that in accordance with the provisions of Sections 22(a) and 41 of the 1939 Internal Revenue Code commissions taxable to you during the year 1951 from the partnership Loving-Weaver, Fort Bragg, North Carolina, are $12,234.18. Since you did not report any income from this source, your income is increased by the amount of $12,234.18.

### Additions to Tax Under Section 294(d).

The petitioner R. A. Bryan filed a declaration of estimated tax for the taxable year 1951. Such declaration is dated January 15, 1952. It shows estimated tax of $40,115.56. The petitioners R. A. Bryan and Ruby M. Bryan filed a declaration of estimated tax for the taxable year 1952, dated January 14, 1953, which was received in the district director's office on January 16, 1953. It shows estimated tax of $10,164.80. They filed a declaration of estimated tax for the taxable year 1953, dated December 4, 1953, which was received in the district director's office on December 7, 1953. It shows estimated tax of $57,657.30.

The joint income tax returns of R. A. Bryan and Ruby M. Bryan for the years 1950 to 1953, inclusive, showed adjusted gross income and tax liability as follows:

| Year | Adjusted gross income | Tax liability |
|------|----------------------|---------------|
| 1950 | $113, 679. 56 | $47, 294. 76 |
| 1951 | 129, 004. 06 | 49, 717. 50 |
| 1952 | 95, 000. 00 | 34, 654. 20 |
| 1953 | 165, 374. 41 | 65, 971. 68 |

The petitioners C. B. McNairy and Rowena A. McNairy filed, after the close of the taxable year 1951, a declaration of estimated tax for that year. The amount of tax estimated, $25,906.96, was deposited with the district director on January 25, 1952. They did not file a declaration of estimated tax for the year 1952. On December 8, 1953, there was filed a declaration of estimated tax, dated December 7, 1953, for the taxable year 1953. This purported to be a joint declaration of both the McNairys but was signed by only C. B. McNairy. The estimated tax, in the amount of $23,252.18, was deposited on December 9, 1953, with the district director.

The joint income tax returns of the McNairys for 1950 to 1953, inclusive, disclosed adjusted gross income and tax liability as follows:

| Year | Adjusted gross income | Tax liability |
|------|----------------------|---------------|
| 1950 | $87, 349. 50 | $34, 023. 76 |
| 1951 | 118, 553. 07 | 47, 580. 66 |
| 1952 | 77, 286. 72 | 28, 220. 18 |
| 1953 | 71, 003. 75 | 24, 981. 04 |

The petitioner R. A. Bryan and the petitioner C. B. McNairy were, respectively, president and secretary-treasurer of T. A. Loving & Co., which engaged in construction work involving many millions of dollars. Each of them also had other varied business interests.

During the years in question and for many years prior thereto, T. A.

Loving & Co. had employed the same certified public accountant or his firm to do all of its accounting and to handle all of its tax returns. The policy of this firm was to also prepare the personal tax returns of the officers, for which no separate charge was made. Pursuant to this policy, this accountant prepared all of Bryan's and McNairy's personal income tax returns and declarations. It was the understanding of both Bryan and McNairy that this accountant would prepare all returns and forms for them as well as for the corporation, although there was never any written agreement to this effect. They considered him to be qualified in tax matters and relied upon him. In one or more of the years prior to 1951 Bryan and McNairy had received revenue agents' reports proposing adjustments to taxes, which this accountant handled. Some adjustments resulted in deficiencies, but no additions to tax were determined. No question was ever raised as to the requirement for early filing of declarations of estimated tax.

It was the understanding of this accountant and his firm that the filing of declarations of estimated tax on or before January 15 following the taxable year satisfied the law and that no penalty would be enforced. Accordingly, it was routine practice for this firm to prepare declarations at such time. This accountant subscribed to two well-known tax services, both of which clearly stated that timely declarations of estimated tax were required and that penalties were provided for failure to file. This accountant had not made any special study of the law relating to filing declarations of estimated tax until late in 1954.

Pursuant to his practice, the accountant in conjunction with the preparation of the tax returns of T. A. Loving & Co. would gather information regarding estimates to be filed by the corporation's officers in the early part of the year following the taxable year.

In the notices of deficiency the respondent determined additions to the tax as to both the McNairys and the Bryans for the years 1951 to 1953, inclusive, under section 294(d)(1)(A) of the Internal Revenue Code of 1939, for failure to timely file declarations of estimated tax and to pay installments when due. The respondent also determined an addition to tax against the Bryans for the year 1952 under section 294(d)(2) of the Internal Revenue Code of 1939 for substantial underestimate of estimated tax.

The failures of each of the petitioners to timely file declarations of estimated tax for each of the years 1951 to 1953, inclusive, were due to willful neglect and not due to reasonable cause.

OPINION.

The principal issue involved in these consolidated cases is whether the gain derived by the petitioners upon the redemptions of their class

B common stock of the two corporations, Investment and Development, is to be considered as gain from the sale or exchange of property which is not a capital asset, pursuant to section 117(m) of the Internal Revenue Code of 1939.[3]

The petitioners take the position that since the respondent in the notices of deficiency held that the full amount received upon the redemption of their stock constituted ordinary income and relied upon both section 22(a) and section 117(m), his determination was inconsistent; that his main determination was that section 22(a) was applicable; and that the section 117(m) issue is not properly before the Court. We think there is no substance to this contention since the respondent specifically mentioned section 117(m) in the notices of deficiency and this was recognized in the petitions filed. Furthermore, at the hearing counsel for both parties recognized that the primary issue is the applicability of section 117(m). The burden of proof upon this issue is upon the petitioners. *Leland D. Payne*, 30 T.C. 1044, on appeal (C.A. 5), and *Rose Sidney*, 30 T.C. 1155, on appeal (C.A. 2).

A careful consideration of the facts, which we have set out at some length, leaves us in no doubt that these two corporations constituted collapsible corporations within the meaning of section 117(m)(2). They were certainly formed or availed of principally for the construc-

[3] Section 117(m), as added to the Internal Revenue Code of 1939 by section 212 of the Revenue Act of 1950, is applicable to taxable years ending after December 31, 1949, and to gain realized after that date. Insofar as material here it provides:

SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property * * * with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

* * * * * * *

(3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation;

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced; and

(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production.

tion of property. Furthermore, all the facts inevitably point to the conclusion that there was the requisite view to the sale or exchange of stock by the stockholders (whether in liquidation or otherwise) or distributions to the shareholders prior to the realization by the corporations of substantial parts of the net income to be derived from the properties constructed.

On April 17, 1950, which was shortly after organization, each corporation issued class B common stock to an architect, ostensibly as a fee for services, the aggregate par value thereof being $421,324. This issuance was pursuant to written contracts between the corporations and the architect, submitted in accordance with the requirements of the Federal Housing Administration. However, the architect immediately endorsed these certificates and the shares were reissued to the petitioners and W. H. Weaver in the amounts set forth in our Findings of Fact. He was paid a total amount of $24,010 by the individuals, including the petitioners, for this stock. This together with $2,000 paid him by each corporation constituted his fee of $28,010.

Upon the first two projects the corporations were able to obtain total FHA-insured loans aggregating $8,423,000, whereas the cost of construction of the projects was $7,988,541, or an excess of $434,459. One of the projects was completed on or about March 26, 1951, and the second on or about May 25, 1951. Final approval by endorsement of the FHA loan guarantee was made on the first project on May 2, 1951, and on the second on August 10, 1951. On August 31, 1951, the petitioners and Weaver surrendered all their class B common stock for redemption and received from both corporations an aggregate amount of $421,324. While the minutes of the meetings authorizing this redemption stated that the corporations had no need for this money, the fact is, of course, that the corporations were indebted in very large amounts on the FHA-insured loans and, furthermore, prior to the time of these distributions, applications had been made for other large loans to finance two additional projects. We note also that on October 8, 1951, additional class B common stock was issued by the two corporations to W. H. Weaver Construction Co. and T. A. Loving & Co., in which the petitioners were stockholders, in an aggregate amount of $227,775, the testimony being that this was needed for construction of the two new projects.

In connection with the two additional projects a similar procedure was followed. On October 25, 1951, these corporations issued to the architect under similar circumstances additional class B common stock totaling $413,032 par value which was immediately surrendered and reissued to the petitioners and Edith H. Weaver, they paying therefor $20,595.62, which together with $2,000 paid by each corporation, made up the architect's total fee of $24,595.62. The corporations obtained

FHA-insured loans aggregating $8,264,000, which exceeded the construction cost of the two additional projects by $467,672. One of the additional projects was completed on or about November 4, 1952, final approval of the FHA loan guarantee being made on November 19, 1952. The other was completed on or about January 23, 1953, with similar loan guarantee approval on January 28, 1953. Pursuant to resolutions adopted on August 31, 1953, a portion of the class B common stock of each corporation was redeemed at par, the petitioners and Edith H. Weaver receiving an aggregate amount of $197,044.

We think it is quite significant that although both Bryan and McNairy testified, neither of them testified as to their intentions with respect to these projects. Neither of them denied that the purpose was to redeem the class B common stock shortly after completion of the projects. On brief the petitioners make a point of the fact that they continued to have an investment in the corporations through ownership of the class A common stock. This, however, does not affect the result. A view to the redemption of the class B stock is sufficient to require classification of the corporations as collapsible. *Glickman* v. *Commissioner*, 256 F. 2d 108 (C.A. 2), affirming a Memorandum Opinion of this Court. And this need not be the sole or even the principal "view." It is well established that the word "principally" as used in section 117(m) does not modify the words "with a view to." *Burge* v. *Commissioner*, 253 F. 2d 765 (C.A. 4), affirming 28 T.C. 246, and *Weil* v. *Commissioner*, 252 F. 2d 805 (C.A. 2), affirming 28 T.C. 809.

The petitioners, in support of their argument that the instant corporations were not collapsible corporations, point out that here the military authorities owned the land, that the mortgages were insured under Title VIII of the National Housing Act, known as the Wherry Act, and that under the leasing arrangement the housing units could not be disposed of but had to be held for rental in accordance with the terms of the lease. They state that in the *Burge* case, *supra*, and certain other decided cases it was the taxpayer who owned the land, that the mortgages were insured under section 608 of the National Housing Act and that the taxpayers could later sell the properties constructed. But whether or not the corporation sells, or is permitted to sell, the property, is not determinative of the question of whether a corporation should be classified as "collapsible." The statute does not limit itself to cases in which the corporate property is sold or the corporation is collapsed. As pointed out by the Court of Appeals in *Burge* v. *Commissioner*, *supra*, the statute was drawn in broad, general terms to reach the abuse which had arisen, whatever form it might take, and was not limited to cases involving the use of temporary corporations. The statute itself contemplates that a corporation may be "collapsible" even though it continues in existence

and retains the property. It speaks of both distributions to the shareholders and to sales or exchanges of stock by the shareholders whether in liquidation or otherwise. `

The net income which would normally be anticipated in the instant situation would consist of rental income over the life of the property or of the lease. The lease in the instant case was for a term of 75 years and even though it might not be anticipated that income would be derived from the properties over that length of time, nevertheless it seems apparent that at the times of the redemptions herein (which in no instance was later than a year and a half from the times of first receipts of rents) the corporations would not have realized substantial parts of the total net income to be derived from the properties over their useful lives. See *Leland D. Payne*, *supra*. In any event the petitioners have not shown that the corporations at such times had realized substantial parts of the total net income to be derived from the properties.

The petitioners contend that even though the corporations are collapsible corporations within the meaning of section 117(m), that section does not apply here because of the limitation contained in section 117(m)(3)(B) which provides that "this subsection shall not apply to the gain recognized during the taxable year unless more than 70 per centum of such gain is attributable to the property so * * * constructed." It is apparently their contention that if the redemptions were made out of rental income the gain derived by the stockholders is not attributable to the properties constructed. With this we disagree. Since the properties constructed were for rental purposes, obviously the income to be derived from the properties would consist of rentals. In any event, although it appears that large amounts of rental had been received prior to the redemptions, the petitioners have not shown the precise amount of funds from rental available at the times of distributions. Nor have they shown that the redemptions were not made out of the excess of the loans obtained over the construction costs. Such excess was adequate to cover all the distributions. It is now well settled that distributions made out of the proceeds of construction loans are attributable to the property constructed. *Burge* v. *Commissioner*, *supra; Glickman* v. *Commissioner*, *supra; Elizabeth M. August*, 30 T.C. 969, on appeal (C.A. 3); *Leland D. Payne*, *supra;* and *Rose Sidney*, *supra*. But we consider it immaterial whether the distributions in redemption of the stock were paid out of the mortgage loans or whether they were made out of rentals received by the corporations. In either event the gain derived by the shareholders was attributable entirely to the property constructed. It should be added that none of the distributions could be considered

as having been paid out of the capital paid in by Weaver Construction Co., or T. A. Loving & Co., for class B common stock, since that stock was both issued and redeemed at par between the dates of the distributions to the individuals in 1951 and 1953.

In view of the foregoing we hold that the gain derived by each of the petitioners upon the redemption of his stock in Investment and Development is to be treated as gain from the sale or exchange of property which is not a capital asset, pursuant to section 117(m). At the hearing the respondent conceded that the amounts taxable should be reduced by the cost basis of the stock to the petitioners, and he has apparently abandoned any reliance upon section 22(a). Upon the recomputation under Rule 50, the gain upon the redemptions will be computed by taking into consideration the bases used by the petitioners.

### "Salaries" Paid by Fayetteville Building Company.

Each of the petitioners, Bryan and McNairy, received from the partnership, Fayetteville Building Company, in 1952 an amount of $24,837.49 as "salary." Each included in his return only $1,898.98. Each had contributed only $500 to the capital of the partnership.

The respondent included in taxable income of each of these petitioners the full amount paid to him by the partnership. But each of them, relying on *Augustine M. Lloyd*, 15 B.T.A. 82, contends that since his partnership capital account was charged $22,438.51, he is taxable upon only $1,898.98.

This identical problem was presented in *Joe W. Stout*, 31 T.C. 1199. We there took the position that a similar payment made to the taxpayer constituted income under the broad provisions of section 22(a) of the Internal Revenue Code of 1939, except to the extent any portion thereof was paid out of the taxpayer's own capital contribution to the partnership. We also held that the taxpayer was entitled to a deduction of the amount of his capital contribution which was used to pay "salaries" to other partners and that the deduction could in no event be greater than the amount of the capital actually contributed. We discussed the matter in considerable detail in that case and there is no necessity for a repetition. Suffice it to say that the holding is the same in the instant case.

The respondent treated the salaries paid as capital expenditures of the partnership, resulting in the allowance of additional depreciation. The parties have stipulated that proper adjustment of the partnership's depreciation deduction may be made under Rule 50 in the light of our holding.

*Deductibility of Taxes by Fayetteville Building Company.*

In the computation of the net income of the partnership Fayetteville Building Company, the respondent disallowed for each of the fiscal years ended October 31, 1952 and 1953, claimed deductions for taxes paid in connection with the construction of two housing projects, these being Federal social security taxes, Federal unemployment taxes, and North Carolina sales, use, and unemployment taxes. His stated reason was that the amounts paid constituted capital expenditures in connection with construction, and therefore were not deductible as taxes in computing net income. He did allow the deduction of the relatively small portion of Federal social security and unemployment taxes and State unemployment taxes which did not relate to the construction of buildings.

This issue was also presented in *Joe W. Stout, supra,* and the problem was thoroughly discussed in our Opinion in that case. Following our holding there, we hold that the respondent erred in disallowing the claimed deductions on account of the Federal social security and the Federal unemployment taxes. Those taxes are deductible under section 23(a)(1)(A) of the Internal Revenue Code of 1939, section 29.24–5 of Regulations 111, and section 39.24(a)(6) of Regulations 118.

The North Carolina unemployment taxes and the North Carolina use taxes are deductible under section 23(c)(1) of the 1939 Code.

Here, as in the *Stout* case, the record does not disclose the particular provision of the North Carolina statutes under which the sales taxes here involved were imposed, and we assume, as we did in the *Stout* case, that they are the ordinary retail sales taxes imposed by section 105–168 of the General Statutes of North Carolina. In any event, the petitioners, upon whom rests the burden of proof, have not shown that any part of these taxes was imposed directly upon the partnership by section 105–187 of the General Statutes of North Carolina, or any other provision of North Carolina law. Accordingly, we hold, as we did in the *Stout* case, that the petitioners have not shown that they are entitled to deduct, as such, the sales taxes in question under section 23(c) of the Internal Revenue Code of 1939. Nor are they deductible under section 23(a)(1)(A) of the Code as ordinary and necessary business expenses. Rather, they are to be capitalized as part of the cost of the articles purchased or of the buildings of which they became integral parts. Sec. 24(a)(2), I.R.C. 1939.

To the extent the respondent erroneously treated taxes as capital expenditures and allowed a greater depreciation allowance than is proper adjustment will be made, pursuant to the stipulation of the parties, in the recomputations under Rule 50.

*Deductibility of Taxes by Onslow Building Company.*

The respondent in determining the net income of the partnership Onslow Building Company for the fiscal year ended October 31, 1952, disallowed claimed deductions on account of various taxes.

Here also we hold, following our decision in *Joe W. Stout, supra,* that the Federal social security and the Federal unemployment taxes paid by the partnership are deductible under section 23(a)(1)(A) of the Internal Revenue Code of 1939, section 29.24–5 of Regulations 111, and section 39.24(a)(6) of Regulations 118.

The North Carolina unemployment tax paid by the partnership for its fiscal year ended October 31, 1952, is deductible under section 23(c)(1) of the Code. *Joe W. Stout, supra.*

The partnership also paid an amount of $2,282.35 in its fiscal year ended October 31, 1953, which is denominated in the stipulation "Payroll Taxes." While there is no detailed evidence as to what this item constitutes, it appears obvious that it is some combination of Federal social security and unemployment taxes and North Carolina unemployment taxes since none of these are listed by name for the fiscal year ended October 31, 1953. Since all of these taxes are deductible, as held in *Joe W. Stout, supra,* we hold that the respondent erred in disallowing this claimed item.

With regard to the North Carolina sales taxes claimed by the partnership for each of its fiscal years ended October 31, 1952 and 1953, the petitioners have not shown the precise nature thereof, and we think it must be assumed that they are the ordinary retail sales taxes imposed by section 105–168 of the General Statutes of North Carolina. In any event, here again the petitioners have not shown that any part of these taxes was imposed directly upon the partnership. We hold, as we did in *Joe W. Stout, supra,* that these are not deductible as taxes pursuant to any provision of section 23(c), since they were quite apparently paid in connection with the partnership's trade or business. Furthermore, they do not constitute deductible business expenses, but are to be treated as part of the cost of the articles purchased or of the buildings of which they became integral parts. Sec. 24(a)(2).

Here again the respondent determined that the partnership was entitled to an additional depreciation deduction on account of taxes capitalized. The recomputation under Rule 50 will include a computation of the proper amount of depreciation in the light of our holdings herein.

*Bryan Loan.*

In their petition the Bryans for the first time make claim for a deduction from gross income of 1951 of an amount of $16,000 as a worthless debt owing to Ruby M. Bryan from G. B. Bagley. There is no

controversy between the parties as to the fact that there was such an amount owing. However, the respondent contends that the petitioners have not shown that the note became worthless in 1951 and that hence the petitioners are not entitled to the deduction.

We agree with the respondent. The note is not in evidence and we do not know the precise terms thereof. The petitioner Bryan testified that he did not know the terms thereof but thought it was a demand note. He also testified that at the time the note was received there was expectation of repayment. This was in September 1951, yet there is no evidence to show that there was any change in the debtor's financial condition between that time and the end of the taxable year. Bryan testified that he asked the debtor several times to repay it, but that he said he could not repay. Bryan also testified that he knew there were some other debts which Bagley owed and that it was his opinion that he could not have collected anything if he had gotten a judgment. It was Bryan's opinion that Bagley was not worth anything if he had paid his bills. He stated that he based this opinion upon information obtained by talking with the debtor and the bank and learning what the debtor owed. However, he further testified that he did not know how much equity Bagley had in the beer distributing business as of the end of 1951. The debtor was not called as a witness, and there was no detailed showing as to his financial conditions.

On the basis of the record here we think the petitioners have fallen far short of meeting their burden of showing that the debt became worthless during the year 1951. Accordingly there is no basis for allowing the claimed deduction.

### Commission to McNairy From Loving-Weaver.

The petitioner McNairy testified that he did not receive any commissions from the joint venture Loving-Weaver in the year 1951. We have no reason to doubt his truthfulness, and we have found that he did not actually receive any commissions from this source in 1951. However, this is not dispositive of the issue. The respondent in the notice of deficiency determined that in 1951 the petitioner was taxable on an amount of $12,234.18 under sections 22(a) and 41 of the Internal Revenue Code of 1939.[4] At the hearing counsel for the respondent in his opening statement made it clear that the respondent's position was that McNairy was on an accrual basis and that this amount accrued to

---

[4] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *

him in 1951, even though it may not have been actually received in that year. At that time counsel for respondent conceded that if the amount of $12,234.18 was a part of the amount of $22,940.35 which McNairy had received in 1950 and included in his return for that year, then the respondent's determination was erroneous. However, the petitioner has not so shown.

The issue here is whether the petitioners have sustained their burden of showing either that McNairy was not on an accrual basis or if so that no such amount accrued in that year. There is no evidence as to the latter. However, McNairy did testify with respect to his manner of reporting income. He stated that for income tax purposes he reported salaries or commissions when he received them and that he claimed deductions for expenditures for the years in which he paid them, except for the North Carolina State income tax. It was his custom to deduct that tax from income of the year to which it related and not from income of the year in which it was paid. He stated that he thought he was on a cash basis. He did not profess to have a technical knowledge as to methods of accounting; rather the record indicates that he relied upon an accountant who prepared his returns.

The nature of McNairy's business was such that either an accrual method or the cash receipts and disbursements method would properly reflect his income. It may well be that he had elected to employ an accrual method, as contended by the respondent. While, as stated, we do not doubt McNairy's truthfulness, we do not think his testimony is sufficient here to answer the question before us, namely, whether legally he had maintained an accrual system of bookkeeping and reporting. If he had indeed been upon a cash basis, it would have been a simple matter for his accountant to have so testified. Such accountant testified as to other matters, but was asked no questions whatever upon this subject. Under the circumstances, we feel constrained to hold that the petitioner has not met his burden and overcome the presumption in favor of the respondent's determination. In reaching this conclusion, we have ignored certain references by counsel for the respondent on brief to material which, as pointed out by petitioners' counsel, is not in this record.

*Additions to Tax Under Section 294(d).*

The respondent determined additions to tax against both the Bryans and the McNairys for the years 1951 to 1953, inclusive, pursuant to section 294(d)(1)(A) of the Internal Revenue Code of 1939 [5] for

---

[5] SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT.
  (d) ESTIMATED TAX.—
    (1) FAILURE TO FILE DECLARATION OR PAY INSTALLMENT OF ESTIMATED TAX.—
      (A) Failure to File Declaration.—In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful

failure to timely file declarations of estimated tax. For the years 1951 and 1952 the Bryans filed their declarations after the close of those years. For the year 1953 the declaration was filed in December of that year. The McNairys filed their declaration for 1951 after the close of the year, they failed to file a declaration for 1952, and for 1953 their declaration was filed in December of that year.

There seems to be no question between the parties that each of the petitioners was legally required by section 58 of the Internal Revenue Code of 1939 to file declarations of estimated tax on or before March 15 of each year. The income which they had in each prior year would seem to clearly indicate the necessity for filing. In any event, the petitioners have not shown that the facts known or reasonably to be anticipated were such as to bring them without the provisions of section 58.

Bryan and McNairy in their testimony assigned, as their reason for failure to timely file, their reliance upon an accountant who for several years had handled their tax matters and prepared their returns.

The requirement for filing declarations of estimated tax and paying the estimated tax currently had been in the law since 1943 and the requirement was common knowledge. These petitioners are intelligent men and businessmen of wide experience. Even if they were unaware of the requirements of the law their ignorance would not amount to reasonable cause under the statute. *Andre Picard*, 28 T.C. 955. It is our opinion that with regard to their duty to timely file declarations of estimated tax, they may not shift the burden to an accountant and claim that their failure was due to reasonable cause merely because the accountant did not timely prepare declarations and advise them to file them.

It is true that under some circumstances it has been held that reliance by a taxpayer upon professional advice may constitute reasonable cause for failure to comply with the law. *Reliance Factoring Corp.*, 15 T.C. 604. However, in such cases the matter involved was complicated and unusual, justifying such reliance. Even if it were considered that under some circumstances reliance upon an accountant as to the time for filing declarations would be justified, it seems obvious that the reliance would be justified only upon the receipt of definite advice after a reasonable consideration of the matter by the accountant. Here it appears that the petitioners neither asked for definite advice nor did the accountant specifically advise with regard to the required date of filing. It appears that there was no discussion at all between the petitioners and their accountant

neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *

in this respect. Rather, it appears that they were willing to leave this matter entirely to him. He in turn, admittedly without any analysis of the law, assumed that the filing of a declaration on or before January 15 of the succeeding year would meet the requirements of the law. In addition he apparently believed that in any event the probability was that no additions to tax would be asserted for the years in question for the reason that the respondent had asserted none against the petitioners in certain prior years. On brief it is also argued that it was common knowledge that prior to 1950 the respondent had at least tacitly approved a relaxed policy in the enforcement of these provisions and that the taxpayers were lulled into a false sense of security. The record here does not establish such a relaxed policy. In any event, we think that the respondent's failure to determine additions to tax against these petitioners, or generally, would not provide reasonable cause for failure to file declarations for the years in question. The accountant testified that he subscribed to certain well-known tax services but was not aware of the admonitions contained therein with regard to the filing of declarations. The evidence here shows that such tax services did in 1950 publicize a press release by the Treasury Department calling attention to the requirements of the law and to the additions to tax for failure to comply.

Under the circumstances, we think the failures to file were not due to reasonable cause within the meaning of section 294(d)(1)(A) of the Internal Revenue Code of 1939. Rather, we think they were due to willful neglect, and consequently we hold that the petitioners are liable for the additions to tax as provided in section 294 (d)(1)(A). See *Coates* v. *Commissioner*, 234 F. 2d 459 (C.A. 8), affirming a Memorandum Opinion of this Court, and *A. E. Hickman*, 29 T.C. 864.

The respondent also determined an addition to tax against the Bryans for the year 1952 under section 294(d)(2) of the Internal Revenue Code of 1939 [6] for substantial underestimate of estimated tax. Reasonable cause is not involved in this issue. No declaration of estimated tax having been filed for 1952, it is considered that the

---

[6] Section 294(d)(2) provides in part:

(2) SUBSTANTIAL UNDERESTIMATE OF ESTIMATED TAX.—If 80 per centum of the tax * * * exceeds the estimated tax * * * there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax * * * whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter * * * of such year * * * in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year * * * but otherwise on the basis of the facts shown on his return for the preceding taxable year. * * *

estimate for that year was zero, and hence there has been an underestimate of estimated tax within the meaning of the statute.[7] The proper addition to tax under section 294(d)(2) will be computed in the recomputation under Rule 50.

*Decisions will be entered under Rule 50.*

---

[7] *G. E. Fuller,* 20 T.C. 308, affirmed on other issues 213 F. 2d 102 (C.A. 10) ; *H.G. Irby, Jr.,* 30 T.C. 1166, on appeal (C.A. 5) ; *Patchen* v. *Commissioner,* 258 F. 2d 544 (C.A. 5), affirming on this issue 27 T.C. 592 ; *Hansen* v. *Commissioner,* 258 F. 2d 585 (C.A. 9), affirming on this issue a Memorandum Opinion of this Court; and *Abbott* v. *Commissioner,* 258 F. 2d 537 (C.A. 3), affirming 28 T.C. 795.   But cf. *Acker* v. *Commissioner,* 258 F. 2d 568 (C.A. 6), certiorari granted 358 U.S. 940, reversing a Memorandum Opinion of this Court.