*Decision will be entered under Rule 50.*

W. H. Weaver and Edith H. Weaver, Husband and Wife, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 61628. Filed May 29, 1959.

*Claude C. Pierce, Esq.*, and *Stanley Worth, Esq.*, for the petitioners.

*Ralph V. Bradbury, Esq.*, for the respondent.

ATKINS, *Judge:* Respondent determined deficiencies in income tax of the petitioners in the amounts of $127,841.68 and $195,226.67 for the years 1951 and 1953, respectively.

The issues are whether redemptions in 1951 and 1953 of class B stock by Bragg Development Company and Bragg Investment Company in the years 1951 and 1953 resulted in ordinary income to the petitioner-shareholders, pursuant to the provisions of section 117(m) of the Internal Revenue Code of 1939, and whether the petitioner W. H. Weaver realized income under section 22(a) or section 112(k) in 1953 in the amount of $157,798.04 as a result of transactions involving four other corporations. The issue with respect to section 112(k) was raised by the respondent in an amended answer.

FINDINGS OF FACT.

Some of the facts are stipulated and the stipulations are incorporated herein by this reference.

The petitioners are husband and wife who reside in Greensboro, North Carolina, and timely filed joint income tax returns for the calendar years 1951 and 1953 with the collector or district director of internal revenue for the district of North Carolina. Their income was reported on the cash receipts and disbursements method of accounting. The petitioner W. H. Weaver is hereinafter sometimes referred to as Weaver or the petitioner.

In 1949 and during the years in question the petitioners, together with their families owned all of the stock of a corporation, W. H. Weaver Construction Co., Inc., which was engaged in the construction business. At that time R. A. Bryan and C. B. McNairy with three other individuals owned another construction corporation, T. A. Loving & Co.

*Facts as to Bragg Companies Issue.*

Sometime in 1949 the United States military authorities at Fort Bragg, North Carolina, issued an invitation to bid for the construction, financing, and management by private enterprise of 1,000 family-housing units on land forming a part of the Fort Bragg Military Reservation. These units were to be constructed primarily for use by military and Government civilian personnel, and the rental rates to be charged were to be within specified limits. The successful

bidder was to manage the housing development project and receive a lease for a term of 75 years, the annual rental to be $3 per acre. This construction was to be financed by insured mortgages under the provisions of Pub. L. 211, 81st Cong., 1st Sess., approved August 8, 1949, which added Title VIII to the National Housing Act, which title is popularly known as the Wherry Act.

The two corporations above mentioned, T. A. Loving & Co. and W. H. Weaver Construction Co., formed a joint venture known as Loving-Weaver for the purpose of bidding on this construction. Each corporation owned a 50 per cent interest in the joint venture. The joint venture was the successful bidder.

For the purpose of carrying out the project the Bryan-McNairy interests and the Weaver interests caused two corporations to be organized under the laws of North Carolina on or about March 15, 1950. These were Bragg Investment Co., Inc., hereinafter referred to as Investment, and Bragg Development Co., Inc., hereinafter referred to as Development. The Federal Housing Administration required that two corporations be formed, instead of one, to carry out the initial proposal for constructing the 1,000 units, because of the size of the proposed FHA-insured loans. Each of these corporations kept its books and filed its income tax returns on an accrual method and on the basis of a fiscal year ending the last day of February.

The charter of each of the corporations stated that the object for which it was formed was to provide housing for rent or sale, to improve and operate, and to sell, convey, assign, mortgage, or lease any real estate and any personal property. Each charter provided that so long as any property of the corporation was encumbered by a mortgage or deed of trust insured by the Federal Housing Commissioner it should not engage in any business other than the construction and operation of a rental housing project or projects.

In the case of each corporation the authorized capital stock consisted of 100,000 shares of class A common stock having a par value of $1 per share, 3,999 shares of class B common stock having a par value of $100 per share, and 100 shares of preferred stock having a par value of $1 per share.

Under the certificate of incorporation the preferred stock carried the right to noncumulative dividends at 5 cents per share before any dividend or distribution upon the common stock, the class B stock was entitled to noncumulative dividends of 6 per cent out of current net earnings before payment of any dividends on the class A stock and had priority, upon dissolution, over the class A stock. The class B common stock could be retired at $100 per share after the payment of all interest and principal due and after making provision for payment of operating expenses, etc., and after the establishment of a reserve fund for replacements. The original charter provided that

no such stock could be retired until after the completion of the improvements on the property, or before the final endorsement for mortgage insurance by the Federal Housing Commissioner. The class A common stock had the exclusive voting privilege, except in the case of specified defaults, in which case the preferred stock had the right to elect directors. Upon liquidation the class A common stock was entitled to the entire assets after the payment of the preferred stock and the class B common stock.

Each certificate of incorporation also provided that the preferred stock might be retired and should be retired upon, but in no event before, the termination of any contract of mortgage insurance covering any indebtedness to which the FHA was a party. It was also provided that the corporation should not, without approval of the holders of the majority of the shares of the preferred stock, assign, transfer, dispose of, or encumber any real or personal property, including rents, except as permitted by the terms of the mortgage, and should not consolidate or merge with any other corporation, go into voluntary liquidation, effect any plan of reorganization, redeem or cancel any of its shares of preferred stock, or amend the certificate of incorporation.

Each corporate charter was amended on or about October 23, 1951, to provide *inter alia* that the class B common stock could be redeemed only with funds representing earned or donated surplus and only after receipt of written approval of the holder of the majority of the shares of preferred stock, after submission of financial statements and satisfactory evidence that no default existed and that redemption would not jeopardize the interest of the mortgage holder or the insurer. It was further provided that any stock so redeemed should be retired and canceled.

Investment and Development each issued its preferred and class A common capital stock for cash at $1 par value per share, on April 17, 1950, as follows:

| Type of stock | Number of shares | Name in which issued |
|---|---|---|
| Preferred | 100 | Federal Housing Administration. |
| A common | 10 | C. B. McNairy. |
| A common | 120 | W. H. Weaver. |
| A common | 30 | Edith H. Weaver. |
| A common | 25 | C. B. McNairy, III. |
| A common | 25 | Rowena A. McNairy, Trustee. |
| A common | 65 | Ruby M. Bryan, Trustee. |
| A common | 25 | R. A. Bryan. |

Each corporation had the same officers, namely, W. H. Weaver, president, R. A. Bryan, vice president, C. B. McNairy, secretary-treasurer, and Edith H. Weaver, assistant secretary-treasurer.

Prior to the incorporation of Investment and Development, the McNairy and Weaver interests had arranged for the services of an

architect, Seward H. Mott. The FHA required that contracts with architects be in writing and on April 17, 1950, written contracts were executed between Mott and Development and Investment. Those contracts provided that Mott was to receive $2,000 in cash from each of those corporations and was to receive 2,023.71 shares of class B common stock, par value $100 per share, of Investment, and 2,189.53 shares of class B common stock, par value $100 per share, of Development.

On April 17, 1950, Investment issued stock certificate No. 1 in the name of Seward H. Mott for 2,023.71 shares of its class B common stock. Mott immediately endorsed the certificate, which was canceled or retired, and Investment reissued the shares represented thereby as follows:

|  | *Shares* |
|---|---|
| Certificate No. 2—W. H. Weaver | 1, 011. 855 |
| Certificate No. 3—Ruby M. Bryan | 607. 113 |
| Certificate No. 4—C. B. McNairy | 404. 742 |

On April 17, 1950, Development issued stock certificate No. 1 in the name of Mott, representing 2,189.53 shares of its class B common stock. This certificate was also immediately endorsed by Mott and was canceled or retired and Development reissued the same as follows:

|  | *Shares* |
|---|---|
| Certificate No. 2—W. H. Weaver | 1, 094. 765 |
| Certificate No. 3—Ruby M. Bryan | 656. 859 |
| Certificate No. 4—C. B. McNairy | 437. 906 |

(Shares represented by certificate No. 4 were reissued to Rowena A. McNairy on March 1, 1951, by certificate No. 5.)

The actual consideration which Mott was to receive had been fixed prior to the incorporation of Investment and Development. Prior to April 17, 1950, he had received $20,960. The total amount paid to Mott was $28,010 by checks as follows:

| | |
|---|---|
| Bragg Investment Company, Inc. | $2, 000 |
| Bragg Development Company, Inc. | 2, 000 |
| W. H. Weaver | 12, 005 |
| Ruby M. Bryan | 7, 203 |
| C. B. McNairy | 4, 802 |
| Total | 28, 010 |

Each corporation and the Secretary of the Army entered into an agreement entitled "LEASE FOR PRIVATE HOUSING TO BE INSURED UNDER TITLE VIII, NATIONAL HOUSING ACT." The corporation was granted a lease of the land for 75 years at a rental of $3 per acre, in consideration for its various undertakings, the land to be used for the purpose of erecting, maintaining, and operating a housing project consisting of 500 units in accordance with plans and specifications theretofore submitted and to be approved by the Federal Housing Commissioner. The agreement contained detailed provisions as to

the classes to whom the various units might be rented and as to the rental to be charged. It was provided that title to all improvements constructed upon the leased premises by the lessee should, during the term of the lease, remain in the lessee. Upon expiration of the lease, or earlier termination, all improvements were to become the property of the United States Government without compensation, unless the lessee should elect to remove the improvements and restore the premises. It was further provided that the agreement should be binding upon and inure to the benefit of the Government, its assigns, and the lessee and its successors and assigns. It was also provided that the lessee should neither transfer nor assign the lease without the prior written approval of the district engineer.

In 1949 an application (Project No. 053–80001) on behalf of Investment was filed with the FHA to insure a loan in the amount of $4,050,-000. Commitment was obtained on April 19, 1950, based upon the FHA estimate of replacement cost of $4,505,932, which included an item of architect fees of $204,371, which was the amount of the par value of the class B common stock which had been issued to Mott, plus $2,000. Thereafter Investment procured an insured loan in the amount of $4,050,000 and contracted with the joint venture, Loving-Weaver, for the construction of the military housing project at a price of $3,840,350. Construction on the project was commenced on or about April 18, 1950, and was completed on or about March 26, 1951. Final approval by endorsement of the FHA loan guarantee was made on May 2, 1951. Units in the project were first rented on or about November 15, 1950. The dates the completed units became available for occupancy, the available units occupied, and the monthly rentals applicable to the available units were as follows:

| Date | Completed units available for occupancy | Available units occupied | Applicable monthly rental |
| --- | --- | --- | --- |
| Nov. 30, 1950 | 70 | 70 | $5,119 |
| Dec. 30, 1950 | 202 | 202 | 14,890 |
| Jan. 30, 1951 | 274 | 274 | 20,254 |
| Feb. 28, 1951 | 376 | 376 | 28,832 |
| Mar. 30, 1951 | 500 | 500 | 39,447 |

In 1949 an application (Project No. 053–80002) on behalf of Development was filed with the FHA to insure a loan in the amount of $4,373,000. Commitment was obtained on April 19, 1950, upon the FHA estimate of replacement cost of $4,869,325, which included an item of architect fees of $220,953, which was the amount of the par value of the class B common stock which had been issued to Mott, plus $2,000. Thereafter Development procured an insured loan in the amount of $4,373,000 and contracted with the joint venture, Loving-Weaver, for the construction of the housing project at a price of

$4,148,191. Construction on the project was commenced on or about April 18, 1950, and was completed on or about May 25, 1951. Final approval by endorsement of the FHA loan guarantee was made on August 10, 1951. Units in the project were first rented on or about August 15, 1950. The dates the completed units became available for occupancy, the available units occupied, and the monthly rentals applicable to the available units were as follows:

| Date | Completed units available for occupancy | Available units occupied | Applicable monthly rental |
|---|---|---|---|
| Aug. 16, 1950 | 36 | 36 | $2, 646 |
| Sept. 30, 1950 | 168 | 168 | 12, 375 |
| Oct. 30, 1950 | 245 | 245 | 18, 055 |
| Nov. 30, 1950 | 265 | 265 | 19, 548 |
| Dec. 30, 1950 | 315 | 315 | 23, 310 |
| Jan. 30, 1951 | 329 | 329 | 24, 430 |
| Feb. 28, 1951 | 337 | 337 | 25, 110 |
| Mar. 30, 1951 | 337 | 337 | 25, 110 |
| Apr. 30, 1951 | 450 | 450 | 34, 915 |
| May 25, 1951 | 500 | 500 | 39, 485 |

The FHA project analyses contemplated occupancy at 93 per cent; estimated annual gross income of $440,541 from Investment's project and $466,911 from Development's project; and estimated annual net income, after operating expenses and taxes, of $284,506 on the Investment project and $307,232 on the Development project.

The corporate charters, in accordance with FHA requirements, required that cash reserves for replacement be deposited with the mortgagee, in addition to the payment of amortization and insurance. The required yearly reserve deposits were estimated at $24,742 for Investment and $26,442 for Development, and monthly deposits based thereon were made.

On August 20, 1951, joint meetings of the stockholders and directors of Investment and Development were held [1] and pursuant to resolutions adopted, all the class B common stock then outstanding was

[1] The minutes of each such meeting contain the following: "The president announced that the corporation had completed the building operation on the lands of the corporation at Fort Bragg, Cumberland County, North Carolina, and that it was evident that the corporation would have in its hands at the end of the next semi-annual fiscal period, to-wit: August 31, 1951, after the payment of, or segregation of, funds for the payment of all building expenses, taxes, assessments, fees and charges, whether due or accrued, and after the payment of all interest and principal and deposits for taxes, assessments, water rent, mortgage insurance premium and hazard insurance premiums, all as required by the terms of the mortgage executed by this corporation to T. C. Hoyle, Jr., Trustee, and insured by Federal Housing Administration and after the establishment and maintenance of a reserve fund for replacements as called for in paragraph 4(g) of the Certificate of Incorporation a sufficient sum of money to retire all of its Class B Common Stock; that the note executed by this corporation to Security National Bank of Greensboro has been fully disbursed and has secured final endorsement; that the corporation has no productive use for the funds; that it would be to the best interests of the Common Stock holders and of the corporation that the Class B Common Stock be retired on August 31, 1951, which is the end of the semi-annual fiscal period of the corporation."

retired at par, the corporations issuing therefor checks dated August 31, 1951, as follows:

| | Investment | Development |
|---|---|---|
| W. H. Weaver | $101,185.50 | $109,476.50 |
| Ruby M. Bryan | 60,711.30 | 65,685.90 |
| C. B. McNairy | 40,474.20 | 43,790.60 |
| Total | 202,371.00 | 218,953.00 |

In their joint income tax return for the year 1951 the Weavers reported long-term capital gain of $95,419.50 upon the redemption of 1,011.855 shares of class B common stock of Investment and long-term capital gain of $103,237.50 on the redemption of 1,094.765 shares of class B common stock of Development.

In computing their capital gain, the individual stockholders allocated $24,010 of the payments which had theretofore been made to Mott as cost of class B common stock as follows:

| | Investment | Development | Total |
|---|---|---|---|
| W. H. Weaver | $5,766 | $6,239 | $12,005 |
| Rowena A. McNairy or C. B. McNairy | 1,252 | 3,550 | 4,802 |
| Ruby M. Bryan | 1,878 | 5,325 | 7,203 |
| Total | 8,896 | 15,114 | 24,010 |

In determining deficiencies against the petitioners for the year 1951, the respondent held that the full amount received from the redemption of the class B common stock of Development, and the full amount received upon redemption of the class B common stock of Investment, constituted ordinary income within the provisions of section 22(a) and section 117(m) of the Internal Revenue Code of 1939.

At sometime in 1951 the military authorities at Fort Bragg negotiated with Investment and Development for the construction of an additional 1,000 units similar to those described above. As in the case of the first two projects, 500 units were to be built by each of these corporations. The provisions of the agreements were essentially the same as with regard to the prior projects.

In 1951 an application (Project No. 053–80008) on behalf of Investment was filed with the FHA to insure a loan in the amount of $4,214,-000, based upon an FHA estimate of replacement cost of $4,683,694, which included an item of architect fees of $212,595, which was the amount of the par value of the additional class B common stock issued to Mott, plus $2,000, referred to *infra*. Commitment was obtained on June 29, 1951. Thereafter Investment procured an insured loan in the amount of $4,214,000 and contracted with the joint venture, Loving-Weaver, for construction of the project at a price of $3,976,-228. Construction was commenced on or about October 9, 1951, and was completed on or about November 4, 1952. Final approval by endorsement of the FHA loan guarantee was made on November 19,

1952. Units in the project were first rented on or about March 24, 1952. The dates the completed units became available for occupancy, the available units occupied, and the monthly rentals applicable to the available units were as follows:

| Date | Completed units available for occupancy | Available units occupied | Applicable monthly rental |
|---|---|---|---|
| Mar. 24, 1952 | 60 | | $4,405 |
| Apr. 30, 1952 | 142 | 142 | 10,343 |
| May 30, 1952 | 156 | 145 | 11,360 |
| June 30, 1952 | 156 | 133 | 11,360 |
| July 30, 1952 | 244 | 242 | 17,831 |
| Aug. 30, 1952 | 329 | 326 | 24,432 |
| Sept. 30, 1952 | 383 | 383 | 28,942 |
| Oct. 30, 1952 | 476 | 456 | 37,382 |
| Nov. 30, 1952 | 500 | 495 | 39,447 |

In 1951 an application (Project No. 053–80009) on behalf of Development was filed with the FHA to insure a loan in the amount of $4,050,000. Commitment in that amount was obtained on June 29, 1951, based upon an FHA estimate of replacement cost of $4,507,326, which included an item for architect fees of $204,437, which is the par value of the additional class B common stock issued to Mott, plus $2,000, referred to *infra*. Thereafter Development obtained an insured loan in the amount of the commitment and contracted with Loving-Weaver for construction of the project at a price of $3,820,100. Construction commenced on or about October 9, 1951, and was completed on or about January 23, 1953. Final approval by endorsement of the FHA loan guarantee was made on January 28, 1953. Units in the project were first rented on or about April 3, 1952. The dates the completed units became available for occupancy, the available units occupied, and the monthly rentals applicable to the available units were as follows:

| Date | Completed units available for occupancy | Available units occupied | Applicable monthly rental |
|---|---|---|---|
| Apr. 30, 1952 | 48 | | $3,574 |
| May 30, 1952 | 90 | 53 | 6,659 |
| June 30, 1952 | 217 | 211 | 15,996 |
| July 30, 1952 | 300 | 300 | 22,155 |
| Aug. 30, 1952 | 300 | 300 | 22,155 |
| Sept. 30, 1952 | 300 | 299 | 22,155 |
| Oct. 30, 1952 | 300 | 300 | 22,155 |
| Nov. 30, 1952 | 356 | 327 | 27,260 |
| Dec. 30, 1952 | 453 | 363 | 35,145 |
| Jan. 23, 1953 | 500 | 409 | 39,450 |

Here again, as in the case of the first two projects, the FHA project analyses contemplated occupancy at 93 per cent; estimated annual gross income of $440,541 from each of the projects; and estimated annual net income, after operating expenses and taxes, of $284,506 on each of the Investment and Development projects. De-

posits with the mortgagee for replacement reserves were made monthly by Investment and Development based upon an estimate of $24,742 per year.

Under date of October 8, 1951, Investment issued 566.69 shares of class B common stock to W. H. Weaver Construction Company and a like amount to T. A. Loving & Co. On the same date Development issued 572.185 shares of class B common stock to W. H. Weaver Construction Company and a like amount to T. A. Loving & Co. All these shares were issued by each corporation for cash at par value to provide cash to be used for construction of the second 1,000 units. This stock was retired at par on March 2, 1953.

On October 8, 1951, written contracts were negotiated between the two corporations and the architect, Mott, according to the provisions of which Mott was to receive from each corporation $2,000 in cash. In addition it was provided that he should receive 2,105.95 shares of class B common stock of Investment and 2,024.37 shares of class B common stock of Development.

On October 25, 1951, Investment issued in the name of Mott 2,105.95 shares of class B common stock. Mott immediately endorsed the certificate which was canceled or retired, and on November 13, 1951, Investment reissued the shares as follows:

|  | Shares |
|---|---|
| Certificate No. 9—Edith H. Weaver | 1,052.975 |
| Certificate No. 10—Ruby M. Bryan | 631.785 |
| Certificate No. 11—Rowena A. McNairy | 421.190 |

On October 25, 1951, Development issued in the name of Mott 2,024.37 shares of class B common stock. He immediately endorsed the certificate which was canceled or retired, and on November 13, 1951, Development reissued the shares as follows:

|  | Shares |
|---|---|
| Certificate No. 10—Edith H. Weaver | 1,012.185 |
| Certificate No. 11—Ruby M. Bryan | 607.311 |
| Certificate No. 12—Rowena A. McNairy | 404.874 |

Mott was paid $24,595.62 in cash as follows:

| | |
|---|---|
| Bragg Investment Company, Inc. | $2,000.00 |
| Bragg Development Company, Inc. | 2,000.00 |
| Edith H. Weaver | 10,297.82 |
| Ruby M. Bryan | 6,178.68 |
| Rowena A. McNairy | 4,119.12 |
| Total | 24,595.62 |

Here again, as in the case of the first two projects, Mott had agreed with the two corporations and the petitioners upon the above total as the fee he was to receive. In each instance the agreement was made prior to the filing by each corporation with the FHA of its application for mortgage insurance.

On August 31, 1953, special meetings of the directors and the stockholders of the two corporations, Investment and Development, were held. Pursuant to resolutions adopted at such meetings with reference to retirement of 1,049.74 shares of class B common stock of Investment and 920.70 shares of class B common stock of Development, checks were issued by each corporation dated September 21, 1953, as follows:

| Individuals | Investment | Development |
|---|---|---|
| Edith H. Weaver | $52,487 | $46,035 |
| Ruby M. Bryan | 31,492 | 27,621 |
| Rowena A. McNairy | 20,995 | 18,414 |
| Total | 104,974 | 92,070 |

Prior to redeeming the class B common stock, Investment and Development had requested permission of the FHA for such redemption. The letter of the FHA in response thereto is set forth substantially in full in the margin.[2]

The income tax return of the petitioners for the year 1953 included long-term capital gain in the amount of $49,869.76 from the redemption by Edith H. Weaver of 524.87 shares of the class B common stock of Investment, and long-term capital gain of $43,739.49 from the redemption of 460.35 shares of the class B common stock of Development.

In computing their capital gain the individual stockholders allocated $20,595.62 of the payments which had theretofore been made to Mott as cost of the class B common stock as follows:

| Name | Investment | Development | Total |
|---|---|---|---|
| Edith H. Weaver | $5,250.61 | $5,047.21 | $10,297.82 |
| Ruby M. Bryan | 3,150.36 | 3,028.32 | 6,178.68 |
| Rowena A. McNairy | 2,100.24 | 2,018.88 | 4,119.12 |
| Total | 10,501.21 | 10,094.41 | 20,595.62 |

[2] "Your requests for the permission of this Administration for the redemption of Class B common stock in the above identified corporations have been forwarded to us by Mr. James P. McRae, our Director in Greensboro, North Carolina. The requests were for the redemption of stock having a par value of $323,933.00 by the Bragg Investment Company, Inc., and stock with a par value of $316,873.00 by the Bragg Development Company, Inc.

"The redemption provisions of the respective Corporate Charters provide that such stock may be redeemed only with funds representing earned or donated surplus and our Comptroller advises that the maximum permitted by the charter of Bragg Investment Company, Inc., is $218,313.71. The amount is $206,507.43 in the case of Bragg Development Company, Inc.

"This Administration will offer no objection to redemption of stock in the above amounts, subject to the following condition: Inasmuch as liability for the payment of real estate taxes has not been finally determined and in view of the fact that these corporations may become liable for the payment of such taxes the mortgagor corporations shall deposit with the mortgagees funds sufficient to pay the estimated present liability and shall also agree to deposit with the mortgagees monthly, amounts necessary to accumulate in the hands of the mortgagees or their designated agents funds estimated to be sufficient to liquidate the entire tax liability when and if such taxes become due."

In determining deficiences against the petitioners for the year 1953, the respondent held that the full amount received upon redemption of the class B common stock of Investment, $52,487, and the full amount received upon redemption of the class B common stock of Development, $46,033 constituted ordinary income within the provisions of section 22(a) and section 117(m) of the Internal Revenue Code of 1939.

The par value of the class B common stock of each of the corporations, Investment and Development, which had been issued to Mott in connection with each of the projects was capitalized and charged on the books of each corporation as part of construction cost. However, the corporations excluded from their bases for depreciation of the buildings the difference between the par value of the stock issued to Mott and the amounts paid Mott by the individual stockholders.

The income tax returns of Investment showed rental receipts and net income as follows:

| Fiscal year ended | Rents | Net income (or loss) |
|---|---|---|
| Feb. 28, 1951 | $53,464.57 | ($110,535.12) |
| Feb. 29, 1952 | 463,675.51 | 21,403.06 |
| Feb. 28, 1953 | 729,611.82 | (10,748.13) |
| Feb. 28, 1954 | 896,541.39 | (40,276.45) |

The income tax returns of Development showed rental receipts and net income as follows:

| Fiscal year ended | Rents | Net income (or loss) |
|---|---|---|
| Feb. 28, 1951 | $117,046.80 | ($58,069.66) |
| Feb. 29, 1952 | 460,041.23 | 11,927.31 |
| Feb. 28, 1953 | 697,845.96 | (51,045.00) |
| Feb. 28, 1954 | 929,145.04 | (19,854.82) |

The United States Government, pursuant to the power of eminent domain, acquired all right, title, and interest held by the two corporations, Investment and Development, by virtue of the lease contracts hereinabove described, by the filing with the United States District Court for the Eastern District of North Carolina, on November 1, 1957, of a "DECLARATION OF TAKING." The United States deposited with the court an amount of $780,000 as being just compensation. At the time of the trial in the instant case the matter of just compensation had not been completely settled.

Investment and Development were formed or availed of principally for the construction of properties with a view to the realization by their shareholders of gain attributable to the properties through distributions to the shareholders or sales or exchanges of stock by the shareholders, before the realization by the corporations of substantial parts of the net income to be derived from the properties.

*Facts as to Issue Involving Neuse Homes, Inc., Lenoir Homes, Inc., Greenmead Homes, Inc., and Hawthorne Homes, Inc.*

In 1952 and 1953 the petitioner, as an individual, acquired for cash four tracts of land for the purpose of constructing on each such tract a number of rental houses. These purchases were as follows:

| Designation of tract | Acquired from | Cost |
|---|---|---|
| Neuse Homes | I. M. Newton | $47,673.75 |
| Hawthorne Homes | Lenoir Housing Dev. Corp. (a civic development corp.). | 48,840.00 |
| Greenmead Homes | Lenoir Housing Dev. Corp | 19,536.00 |
| Lenoir Homes | Highland Homes, Inc. and Kinwood Homes, Inc. | 12,500.00 |

The construction was financed by separate loans made by Security National Bank, Greensboro, North Carolina, to the petitioner as an individual. In connection with the loans the petitioner submitted a personal financial statement to the bank. The loans were obtained on notes signed by the petitioners and secured by deeds of trust on the properties. In one instance, that of the Neuse Homes project, the note was also secured by the endorsement of Thomas Wilson and his wife. Prior to obtaining these loans the petitioner financed the construction from his own funds.

It was contemplated, prior to the commencement of construction, that eventually the improved properties would be taken over by four corporations. Prior to the commencement of construction, FHA mortgage insurance commitments were secured (under title IX, section 903 of the National Housing Act, 12 U.S.C. sec. 1750b) by Weaver Realty Company, as mortgagee, in the names of four corporations, as mortgagors, in aggregate amounts as follows:

| Name of corporation | Amount |
|---|---|
| Neuse Homes, Inc | $594,150 |
| Hawthorne Homes, Inc | 465,850 |
| Greenmead Homes, Inc | 206,300 |
| Lenoir Homes, Inc | 426,050 |
| Total | 1,692,350 |

These aggregate amounts in each instance were made up of individual mortgage commitments on each home to be erected in each project. The number of homes to be erected were as follows: Neuse Homes 82 houses, Hawthorne Homes 55 houses, Greenmead Homes 25 houses, and Lenoir Homes 55 houses.

Weaver Realty Company was a corporation of which the petitioner and his family were the only shareholders, and of which the petitioner was president. It conducted a mortgage and loan business, general insurance business, property management business, and was also a real estate broker. It was an FHA-approved mortgagee.

Weaver Realty Company then made commitment deposits with Federal National Mortgage Association (FNMA) and obtained commitments (upon a representation that such mortgages could not be sold to private lending agencies) whereby the latter agreed to purchase from Weaver Realty Company the FHA-insured notes and deeds of trust to be executed by the four corporations in amounts as set forth above. All applications were made by Weaver Realty Company as mortgagee, and were executed by the petitioner as president thereof.

During the period of construction of the homes on each tract the petitioner caused the four corporations just above referred to to be incorporated under the laws of North Carolina for the purpose of eventually owning and operating the properties. At organization the petitioner received 500 shares of $1 par value of stock of each corporation in exchange for $500 in cash.

The construction work was performed in each instance by W. H. Weaver Construction Company, Inc., except that in the case of the Neuse Homes project construction was done pursuant to a partnership arrangement between the petitioner and Thomas Wilson. The construction was in accordance with plans and specifications submitted to and approved by the FHA.

Upon completion of each project, the petitioner transferred the land and buildings to the corporation in exchange for 500 shares of common stock of the corporation. In the case of all four projects, all construction and all arrangements for financing had been completed prior to the transfer to the corporations. At the time of delivery to the corporations some of the units in each project had already been rented. In each instance the corporation assumed the outstanding liabilities on the various properties owing to Security National Bank.

At all times pertinent hereto petitioner has been president and treasurer of each of the four corporations and owned all their capital stock.

On the books and records of Lenoir Homes, Inc., the transfer of land and buildings from the petitioner was recorded on May 1, 1953, by the following journal entry (and this was typical of the entries made by the other corporations) :

|  | Debit | Credit |
|---|---|---|
| Land | $13,881.86 | |
| Buildings | 401,618.14 | |
| Mortgage Payable | | $415,000.00 |
| Capital Stock | | 500.00 |

To record transfer of properties from W. H. Weaver to Lenoir Homes, Inc. in a tax-free exchange consisting of land and buildings and mortgage thereon for 500 shares of $1.00 par value stock.

On his double entry bookkeeping records the petitioner recorded the transfer to Lenoir Homes, Inc., as follows, by journal entry dated May 31, 1953 (and this was typical of the entries which he made with respect to the transfers to the other corporations):

|  | Debit | Credit |
|---|---|---|
| Mortgage Payable | $415,000.00 | |
|   Land—Lenoir | | $12,500.00 |
|   Building—Lenoir | | 361,694.51 |
|   Stock—Lenoir | | 40,805.49 |
| Stock—Lenoir | 40,805.49 | |
|   W. H. Weaver—Capital | | 40,805.49 |

To reduce negative basis of stock received by Lenoir Homes, Inc. in tax-free exchange for land and buildings and mortgage thereon to zero.

In each instance the corporation held a special meeting of the stockholders and directors authorizing the issuance of 500 shares of common capital stock in exchange for the properties. The minutes of the meeting in the case of Lenoir Homes, Inc., held on April 10, 1953, which is typical of the minutes of the other corporations, contain the following:

The directors considered the matter and unanimously passed the following resolution:

Whereas W. H. Weaver has offered to convey 55 houses and lots in Greenmead in Kinston, N.C., to this Corporation subject to the mortgage to Security National Bank of Greensboro of $415,000.00 in exchange for 500 shares of the common capital stock of this corporation; and the conveyance to be effective as of May 1, 1953, with the understanding and agreement that the deed to Lenoir Homes shall be made as soon as possible and actual settlement for the property to be made on May 1, 1953, and,

Whereas in the opinion of this Board of Directors this property subject to the mortgage aforesaid has a value at least equal to the par value of said stock,

Now, therefore, be it resolved that this Corporation acquire from W. H. Weaver said land and premises and the officers of this Corporation are authorized and directed to issue common capital stock to said Weaver in exchange for his equity in said land and premises.

Mr. Weaver . . . [also stated . . .] he had negotiated with Weaver Realty Company for loans on each of the houses owned by Corporation, to be secured by Deeds of Trust on the property payable over 30 years, and that Weaver Realty had committed itself to make loans in the highest amount F.H.A. would insure. Mr. Weaver stated in his opinion it was to the best interest of the Corporation to accept such loans and retire the indebtedness due to Security National Bank of Greensboro . . . following resolution was unanimously adopted:

Be it resolved that this Corporation borrow from Weaver Realty Company $426,050.00 . . . and . . . evidence said debt by 55 notes of said company payable with 4¼% interest over 30 years. To secure each note with Deed of Trust upon one of the houses in accordance with the terms of the F.H.A. commitment. President and Secretary are authorized to execute such notes and Deeds of Trust in the Corporation name.

The amounts of loans which the petitioner had obtained and which were assumed by the four corporations, the cost of land and buildings to the petitioner, and the difference between these two figures are as follows:

| Name | Amounts loaned to Weaver by Security National Bank and assumed by corporation | Cost of land and buildings to the petitioner [1] | Excess of loans loans over costs [2] |
|---|---|---|---|
| Neuse | $574, 500 | $515, 112. 10 | $59, 387. 90 |
| Hawthorne | 454, 000 | 414, 801. 25 | 39, 198. 75 |
| Greenmead | 200, 000 | 181, 594. 10 | 18, 405. 90 |
| Lenoir | 415, 000 | 374, 194. 51 | 40, 805. 49 |
| Total | 1, 643, 500 | 1, 485, 701. 96 | 157, 798. 04 |

[1] Included in these figures are certain amounts expended by the petitioner in improvements consisting of streets and paving, curbs, gutters, sewers, water and utilities which had been substantially completed at a time 6 months and 1 day prior to the transfers of the properties to the corporations. The amounts of such expenditures were as follows: Neuse, $40,025.84; Hawthorne, $39,623.65; Greenmead, $18,010.75; Lenoir, $39,623.65.
[2] In the case of each of the corporations the tax returns show the elimination from the basis for depreciation of the buildings the respective amounts shown in this column.

The chronological order of the events was as follows:

| | Neuse | Hawthorne | Greenmead | Lenoir |
|---|---|---|---|---|
| Date of deed to Weaver of land acquired | Apr. 1, 1952 | Jan. 29, 1953 | Feb. 11, 1953 | {Aug. 14, 1952 {Sept. 15, 1952 |
| FHA mortgage insurance approved | {Apr. 22, 1952 {June 25, 1952 | }Dec. 12, 1952 | Dec. 19, 1952 | Sept. 2, 1952 |
| FNMA commitment obtained | July 29, 1952 | Dec. 23, 1952 | Dec. 29, 1952 | Sept. 5, 1952 |
| Construction of houses commenced | Aug. 14, 1952 | Dec. 29, 1952 | Jan. 5, 1953 | Sept. 16, 1952 |
| Corporation organized | Oct. 2, 1952 | Apr. 7, 1953 | Apr. 7, 1953 | Apr. 7, 1953 |
| Initial loan to Weaver from Security National Bank | Jan. 19, 1953 | Aug. 1, 1953 | July 17, 1953 | Apr. 10, 1953 |
| Assets exchanged for stock | Apr. 1, 1953 | Sept. 1, 1953 | Sept. 1, 1953 | May 1, 1953 |

Thereafter each corporation obtained a loan from Security National Bank upon each of the individual houses. The procedure employed by Lenoir Homes, Inc., was typical of the procedure taken by each corporation as hereinafter described. On May 1, 1953, a loan of $426,050 was made by the Security National Bank to Lenoir Homes, Inc., which was secured by 55 notes insured by the FHA and 55 separate deeds of trust and by the personal guarantee of the petitioner, supported by his individual financial statements. No financial statements were required of Lenoir Homes, Inc. At that time the liability of petitioner assumed by Lenoir Homes, Inc., was liquidated out of the proceeds of said loan. On July 1, 1953, Security National Bank received a check from FNMA made payable to Weaver Realty Company which was endorsed by Weaver Realty over to Security National Bank, thereby liquidating the loan from the bank to Lenoir Homes, Inc.

The books and records of Neuse Homes, Inc., Hawthorne Homes, Inc., Greenmead Homes, Inc., and Lenoir Homes, Inc., disclose no

contracts for services with the petitioner, nor do they disclose any payments to petitioner.

Prior to the transfer by the petitioner of the land and holdings to the four corporations he had held the lots for a period of more than 6 months. Six months and 1 day prior to the transfer of the properties by the petitioner to each of the corporations the percentage of completion of the construction of the buildings was as follows: Neuse 25 per cent, Hawthorne 33⅓ per cent, Greenmead 33⅓ per cent, and Lenoir 25 per cent.

Over the period from 1947 through 1952 the petitioner had engaged in as many as 13 other projects for construction of housing through the use of corporations. Prior to the hearing he had disposed of his interest in 6 of them, and continued to own 3. The record does not disclose whether he had disposed of the other 4. In none of such other instances was the construction done by the petitioner and then transferred to the corporation as was done in the case of the 4 corporations here involved.

In their joint income tax return for the year 1953, the petitioners did not report any income from the transactions hereinabove described. The return contains the following statement:

The taxpayer transferred land and buildings to the following corporations for stock, the corporations assuming the outstanding mortgages on the properties:

> Neuse Homes, Inc.
> Lenoir Homes, Inc.
> Greenmead Homes, Inc.
> Hawthorne Homes, Inc.

The transactions are nontaxable under the provisions of Section 112(b)(5) of the Internal Revenue Code; therefore, no gain or loss is recognized.

In such return rental income received and expenses paid in connection with the properties prior to the transfer to the corporations were reported.

In the notice of deficiency for the year 1953, the respondent determined that the petitioners "realized income within the provisions of Section 22(a) of the 1939 Internal Revenue Code in the amount of $157,798.04 for personal services rendered, directly or through corporations, in connection with the promotion, financing and construction of the housing projects."

Prior to the trial of this case the respondent amended his answer to state that he "affirmatively alleges in the alternative" that if the Court should find that the petitioners did not realize ordinary income within the provisions of section 22(a) in the amount of $157,798.04 in 1953 for personal services rendered, directly or through corporations in connection with the promotion, financing, and construction of the four projects, the petitioners alternatively realized

short-term capital gains of $157,798.04 in 1953 within the provisions of section 112(k) of the Code. Therein the respondent alleged as facts in support of his alternative pleading that the various liabilities assumed by the corporations exceeded the basis which petitioners had in the land and buildings transferred by the aggregate amount of $157,798.04; that the principal purpose of petitioners with respect to the transfers and the assumption or acquisition of the liabilities by the corporations was to avoid Federal income tax on the exchange; that no bona fide business purpose was served by the transfers and the assumption or acquisition of the liabilities by the corporations; and that the various parcels of improved realty so transferred were held by the petitioners prior to the transfers for a period of less than 6 months.

The principal purpose of the petitioner with respect to the assumption or the acquisition by the four corporations of the indebtedness was a purpose to avoid Federal income tax on the exchanges. The gain to the petitioners upon the exchanges was at least $206,648.04.

OPINION.

The first issue is whether the petitioners are taxable upon the gain realized in 1951 and in 1953 from redemptions of their class B common stock of Investment and Development as income from the sale or exchange of property which is not a capital asset, pursuant to section 117(m) of the Internal Revenue Code of 1939.

In *R. A. Bryan*, 32 T.C. 104, the same issue was presented by other stockholders of these corporations. We there carefully considered the problem and held that these corporations were collapsible corporations within the meaning of section 117(m), and that gain derived by those stockholders upon the redemption of their stock was to be considered as gain from the sale or exchange of property which is not a capital asset. For the same reasons we make the same holding here. We need add nothing here to the discussion included in our Opinion in that case. Upon the recomputation under Rule 50 the gain upon the 1951 and 1953 redemptions here involved will be computed by taking into consideration the bases used by the petitioners.

The next question for consideration is whether for the year 1953 the petitioners are taxable upon the amount of $157,798.04 as a result of the transactions described in our Findings of Fact involving the construction of houses and the transfer thereof to four corporations wholly owned by the petitioner.

Briefly stated the essential facts are: The petitioner individually, and out of his own funds, purchased in 1952 and 1953 four tracts of land; he then obtained loans from a bank upon notes signed by him-

self and his wife and secured by deeds of trust on the properties, the aggregate amount so borrowed being $1,643,500; he then improved these properties by building a total of 217 houses thereon at a total cost, including the cost of the land, of $1,485,701.96; thus the excess of the loans obtained over the cost was $157,798.04; upon completion the petitioner transferred these properties to four corporations, which he had set up and which were wholly owned by him; in each instance the corporation issued additional stock to him and assumed the outstanding liability on the property owing to the bank; these corporations then obtained loans from the same bank, insured by the FHA and secured by deeds of trust and by the personal guarantee of the petitioner; in each instance the original loan to the petitioner which had been assumed by the corporation was then satisfied out of the proceeds of the new loan; then Weaver Realty Company sold notes of these corporations to the Federal National Mortgage Association and checks of that organization were endorsed by Weaver Realty Company over to the bank, thereby liquidating the loans from the bank to the four corporations.

It is clear that from the beginning it was the intention of the petitioner to transfer these properties to the four corporations. Prior to any construction, and indeed prior to the actual purchase of some of the land, the petitioner had caused his corporation, Weaver Realty Company, as mortgagee, to obtain FHA mortgage insurance commitments in the names of the four prospective corporations as mortgagors and commitments of the Federal National Mortgage Association to purchase the FHA-insured notes and deeds of trust to be executed by the four corporations. The corporations themselves were set up during the process of construction. After all the contemplated steps had been taken, the petitioner had retained $157,798.04 of his original bank loans and the four corporations had assumed and paid off such indebtedness out of loans obtained by them.

The step by which Weaver Realty Company sold notes of the four corporations to FNMA and in connection with which it received checks from FNMA is not made entirely clear by the stipulation. We do know that it was originally contemplated that Weaver Realty Company, which was an FHA-approved lending institution, was to be the mortgagee, and we know from the minutes of the corporate meetings held in connection with the transfer of properties to the four corporations that it was contemplated that Weaver Realty would lend as much money to the corporations as FHA would insure. We also know from the stipulation that when Weaver Realty Company endorsed over the checks of FNMA to the four corporations this had the effect of "liquidating" the loans which the four corporations had obtained from the bank. With respect to those loans the petitioner

had given his personal guarantee. The fact that these loans were "liquidated" may indicate that the petitioner's secondary liability did not survive these last transactions, but as to this the record is not entirely clear. But be that as it may, the record is clear that the four corporations did assume and pay the petitioner's original personal indebtedness and that thereafter he had no primary liability with respect to any indebtedness.

The petitioners included no amount in their return for 1953 on account of these transactions, stating therein that the transactions were tax free under section 112(b)(5) of the Internal Revenue Code of 1939. The respondent in the notice of deficiency held that the amount of $157,798.04 constituted income within the provisions of section 22(a) of the Internal Revenue Code of 1939,[3] "for personal services rendered, directly or through corporations" in connection with the promotion, financing, and construction of the housing projects. By amendment to his answer made before the trial, the respondent alternatively invoked the provisions of section 112(k) of the Code. Pertinent provisions of section 112 of the Code are set out in the margin.[4]

---

[3] SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) EXCHANGES SOLELY IN KIND.—

* * * * * * *

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.

* * * * * * *

(c) GAIN FROM EXCHANGE NOT SOLELY IN KIND.—

(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5), or within the provisions of subsection (1), of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph or by subsection (1) to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be

In support of the determination made in the notice of deficiency the respondent contends that the petitioner performed many and various services for the four corporations and that the *quid pro quo* was the assumption of his personal obligations by the corporations and that accordingly the $157,798.04 should be taxed to him as income from personal services under section 22 (a).

Here the record shows that no contracts for services were entered into and that the corporations did not purport to pay the petitioner anything for services. The attorney who advised the petitioner and who was an officer and director of the corporation testified that there was no agreement or understanding that the petitioner was to be compensated for any services. Actually the petitioner chose to construct the properties and then transfer them to the corporations in exchange for stock and the assumption of liabilities, and that is what actually occurred. The transactions were so treated by both the petitioner and the corporations on their records. On this record it cannot be concluded that the petitioner was paid $157,798.04 for services rendered, and hence the respondent cannot be sustained upon the ground advanced in the notice of deficiency. It may be observed that even if the petitioner did render valuable services to the corporations, he was free to elect not to charge for any such services. See *George M. Gross*, 23 T.C. 756, affd. (C.A. 2) 236 F. 2d 612.

As stated, the argument of the petitioners is that the transactions come within section 112 (b) (5) and that no gain is to be recognized. The respondent by his amended answer alternatively raised the issue of section 112 (k), stating that the principal purpose of the petitioner in causing the corporations to assume the indebtedness was a purpose to avoid Federal income tax on the exchange or that such purpose was not a bona fide business purpose.

---

recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

\* \* \* \* \* \*

(k) Assumption of Liability Not Recognized.—Where upon an exchange the taxpayer receives as part of the consideration property which would be permitted by subsection (b) (4), (5), or (10) of this section to be received without the recognition of gain if it were the sole consideration, and as part of the consideration another party to the exchange assumes a liability of the taxpayer or acquires from the taxpayer property subject to a liability, such assumption or acquisition shall not be considered as "other property or money" received by the taxpayer within the meaning of subsection (c), (d), or (e) of this section and shall not prevent the exchange from being within the provisions of subsection (b) (4), (5), or (10) ; except that if, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid Federal income tax on the exchange, or if not such purpose, was not a bona fide business purpose, such assumption or acquisition (in the amount of the liability) shall, for the purposes of this section, be considered as money received by the taxpayer upon the exchange. In any suit or proceeding where the burden is on the taxpayer to prove that such assumption or acquisition is not to be considered as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

On this issue the parties are at odds as to which has the burden of proof. Despite the fact that the petitioners in their return specifically relied upon the nonrecognition provisions of section 112(b)(5), the respondent in the notice of deficiency did not refer to that section or to section 112(k), but rather held that under section 22(a), the petitioner received ordinary income by way of compensation for personal services. He thus pinpointed the reason for his determination. His alternative reliance upon section 112(k) is inconsistent with the theory set forth in the notice of deficiency. In his amended answer he has pleaded new matter as to which, under our prior holdings and our Rule 32,[5] the burden of proof is upon him. See *Thomas Wilson*, 25 T.C. 1058, appeal dismissed (C.A. 4, 1957); *W. H. Weaver*, 25 T.C. 1067; and *Arthur Sorin*, 29 T.C. 959.

As originally enacted section 112(b)(5) made no reference to the assumption of liabilities. Such section as it existed in the year in question resulted from amendments made by section 213 of the Revenue Act of 1939, and that section also enacted section 112(k), the result being to make it clear that the assumption of liabilities in bona fide business transactions would not result in recognition of gain. However, Congress recognized that there might be abuses and to that end it specifically provided in section 112(k) that the liability assumed would be considered as money received upon the exchange, resulting in recognition of gain, if "taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid Federal income tax on the exchange, or if not such purpose, was not a bona fide business purpose."[6]

---

[5] Rule 32 of the Rules of Practice before this Court reads:

The burden of proof shall be upon the petitioner, except as otherwise provided by statute, and except that in respect of any new matter pleaded in his answer, it shall be upon the respondent.

[6] The report of the Ways and Means Committee on the Revenue Bill of 1939 (H. Rept. No. 855, 76th Cong., 1st Sess.), 1939-2 C.B. 518, reads in parts as follows:

It has long been the policy in our income-tax law to give due consideration to the exigencies of business in connection with corporate reorganizations by postponing, in certain specifically described instances, the recognition of gain realized in such transactions. In general, if gain is realized in such a transaction, nonrecognition of the entire gain is allowed only where, under the specifically defined circumstances, the taxpayer transfers property and receives in exchange therefor stock or securities in a corporation which is a party to the reorganization. If, in addition to such stock or securities, other property or money is received, gain is recognized to the extent of such other property or money.

The recent Supreme Court case of *United States* v. *Hendler* (303 U.S. 564 (1938)) has been broadly interpreted to require that, if a taxpayer's liabilities are assumed by another party in what is otherwise a tax-free reorganization, gain is recognized to the extent of the assumption. In typical transactions changing the form or entity of a business it is not customary to liquidate the liabilities of the business and such liabilities are almost invariably assumed by the corporation which continues the business. Your committee therefore believes that such a broad interpretation as is indicated above will largely nullify the provisions of existing law which postpone the recognition of

The respondent contends that, even though we conclude that the burden of proof is upon him, nevertheless on the record here he has sustained the burden of proving that the petitioner's principal purpose with respect to the assumption of the liabilities by the corporations was a purpose to avoid Federal income tax on the exchange. We agree. We think that the preponderance of the evidence here establishes that the petitioner's principal purpose in causing the corporations to assume the indebtedness was a purpose to avoid tax on the exchange, namely tax on the amount of the indebtedness in excess of his basis of the property, which he retained. Indeed, no other explanation for the method employed is apparent from this record. From the beginning he had in mind to set up the four corporations. To that end he caused his wholly owned corporation Weaver Realty Company to obtain FHA loan commitments and FNMA note purchase commitments in the names of the four prospective corporations before any construction was ever started, and in some instances even before he purchased the land. The plans and specifications were known since they had to be approved by the FHA. He then personally borrowed the money and caused his company, Weaver Construction Co., to construct the buildings. It was not until the construction was substantially complete that he set up the corporations. The record shows that the petitioner had had much experience in the building business and from the beginning he may have had reason to believe that the cost of construction would not amount to the full amount of the loans. In any event, when the four corporations received the properties and assumed and paid the total indebtedness the actual costs were known, and yet the petitioner caused such corporations to assume the entire indebtedness while he retained the excess of the loan over and above his costs. Thereupon this excess, which was in the amount of $157,798.04, was subject to his free use and disposition without any obligation on his part to repay the same.

The attorney who advised the petitioner testified that his advice to the petitioner was to refrain from undertaking long-term personal liabilities in order that his personal estate might not be liable therefor, and that the best way to avoid that was to organize corporations.

---

gain in such cases. To enable bona fide transactions of this type to be carried on without the recognition of gain, the committee has recommended section 213 of the bill.

'Section 213(a) of the bill amends section 112 of the Internal Revenue Code by adding a new subsection (k), which provides that in transactions otherwise within section 112(b) (4) or (5), or 112 (c) or (d) (in so far as they relate to exchanges under section 112(b) (4) or (5)) gain shall not be recognized to the transferor on account of the assumption of liabilities or the transfer of property subject to liability. It is expressly provided that this provision shall not apply where it appears that the principal purpose of the taxpayer whose liabilities are assumed or who transfers property subject to a liability was a purpose to avoid Federal income tax on the exchange, or if not such purpose, was not a bona fide business purpose. In such cases, if a taxpayer's liabilities are assumed or he transfers property subject to a liability, the amount of the assumption or the amount of such liability shall be considered as money received by the taxpayer upon the exchange and gain, to the extent thereof, will be recognized.

He stated that he also discussed the tax consequences and advised that the transaction would be nontaxable under section 112(b)(5), and conceded that the petitioner might have had other motives than to simply protect his personal estate against long-term obligations. The petitioner himself took the stand, but did not testify with respect to his principal purpose. If it were true that the petitioner's principal purpose was to insulate his personal estate against long-term indebtedness, it certainly would have been much simpler to immediately form the corporations, which he then had in mind forming, and have them obtain the loans, insured by FHA under the original commitments, and construct the buildings. The fact that the petitioner entered into the more complicated transaction of first obtaining personal loans and then causing the corporations to assume and pay them indicates to us that his principal purpose was to avoid tax on any excess of the loans obtained over the cost of the properties and retained by him.

Since we have concluded that the petitioner's principal purpose with respect to the assumption of the liabilities by the four corporations was a purpose to avoid tax, it is immaterial under the statute whether such purpose might otherwise be considered not a bona fide business purpose.

It is our conclusion that the amount of the liability assumed in each transaction must be considered as money received by the petitioner upon each exchange and that the gain upon each transaction is to be recognized to the extent of the liability assumed.

We turn then to a consideration of whether the respondent has met his burden of proving that the transactions resulted in gain. On the exchanges of the properties the amount realized by the petitioner consisted of stock, and the amount of the liabilities assumed, $1,643,500. See secs. 111 and 112(k) of the Code. See also *Crane v. Commissioner*, 331 U.S. 1. The stock had a fair market value at least to the extent that the properties had value over and above the indebtedness assumed. We think it clear that the properties had a fair market value of at least $1,692,350, which was the amount of the FHA-insured loans previously arranged but obtained shortly after the transfers to the corporations. Thus the stock itself had a fair market value of at least $48,850. We note also that the corporate minutes recite in effect that the properties had value in excess of the indebtedness assumed. It follows that the total consideration received by the petitioner was at least $1,692,350, and since the basis of the assets in the petitioner's hands was $1,485,701.96, the gain amounted to at least $206,648.04 and we have so found as a fact.

There remains the question of whether the gain is to be treated as ordinary income, or as long-term or short-term capital gain. The petitioners take the position that any gain attributable to the land

or to the portions of the properties which had been constructed 6 months and 1 day prior to the date of transfer must be considered as long-term capital gain. On brief the respondent relies upon section 117(o) of the Internal Revenue Code of 1939.[7] The petitioner claims that the respondent is raising a new issue in suggesting section 117(o). It is true that in his amended answer the respondent alleged that the petitioners realized short-term capital gains of $157,798.04, stating that the various parcels of improved realty had been held by the petitioner for less than 6 months prior to the dates of transfer. But the provisions of section 117(o) cannot be ignored since the facts of record bring that section into operation here. The petitioner owned 100 per cent in value of the outstanding stock of the corporations, and it has been stipulated that the corporations were organized for the purpose of owning *and operating* the properties. Clearly then the buildings in the hands of the transferees are property of a character which is subject to the allowance for depreciation, requiring a holding that any recognized gain attributable to the transfer of the buildings *shall be considered* as gain from the sale or exchange of property which is neither a capital asset nor property described in section 117(j)—that is, the gain is to be considered as ordinary income which is taxable in full. The language of section 117(o) clearly embraces the instant situation, and its scope should not be limited because of the fact that in the congressional committee reports on section 328 of the Revenue Act of 1951 (which enacted section 117(o)) the illustration given involved a situation different from that here presented.[8]

---

[7] (o). GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION.—

(1) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in paragraph (2)—

\* \* \* \* \* \* \*

(B) between an individual and a corporation more than 80 per centum in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in subsection (j).

(2) SUBSECTION APPLICABLE ONLY TO SALES OR EXCHANGES OF DEPRECIABLE PROPERTY.—This subsection shall apply only in the case of a sale or exchange of property by a transferor which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 23(1).

[8] H. Rept. No. 586, 82d Cong., 1st Sess., 1951–2 C.B. 357, 376, states in part:

Section 310 [enacted as section 328] of this bill is intended to forestall the practice of selling depreciable assets to controlled corporations in order to obtain the substantial tax benefits available under existing law. This practice, which is reported by the Bureau of Internal Revenue to be of growing importance, may be illustrated as follows: Assume that a husband and wife own and operate a corporation engaged in retail trade, that they also own as individuals the building used by this corporation and that the current value of the building is well in excess of its adjusted basis. If the building is sold to the corporation, a capital-gains tax will ordinarily be paid, but the building then has, in the hands of the corporation, an adjusted basis which is greater than the basis in the hands of the individual shareholders by the amount of the gain realized on the sale to the corporation. The property being depreciable the corporation will then be able to write off the increase in the adjusted basis over the remaining life of the building. The

The land upon which the buildings were constructed was, however, held for more than 6 months and if any of the gain is attributable to the sale of the land it would be considered as long-term capital gain. See *Helen M. Dunigan, Administratrix*, 23 B.T.A. 418, affd. (C.A.D.C.) 66 F. 2d 201.

Since the land had been held only shortly more than 6 months at the time of transfer, except in the case of the Neuse Homes land which had been held for 1 year, it is not likely that there was a large enhancement in the value of the land, over its cost to the petitioner, during the time it was held by the petitioner. However, it is possible that some of the gain was attributable to the land. We think it not unreasonable to assume for present purposes that a portion of the gain, at least equal to the proportion which the cost of the buildings bears to the total cost of all the property, represents gain attributable to the buildings. The total cost of all the property was $1,485,701.96, and the total cost of buildings was at least $1,219,868.32 (assuming that the amounts expended by the petitioner for paving, sewers, water and utilities, etc., is not to be considered as cost of the buildings). As pointed out above, the gain was at least $206,648.04. That portion of $206,648.04 which $1,219,868.32 bears to $1,485,701.96 is well in excess of the $157,798.04 in question herein.

In view of the foregoing we hold that the petitioner is taxable upon the amount of $157,798.04 as ordinary income.

It should be added that although counsel for respondent on brief makes some reference to the collapsible corporation provisions, section 117(m), in connection with these four corporations, that section has not been put in issue on this phase of the case, and we do not understand that the respondent contends that such issue has been raised. It is also noted that both parties have in their briefs discussed section 357 of the Internal Revenue Code of 1954, which provides that upon the transfer of property to a controlled corporation, any amount of liability assumed or acquired by a corporation in excess of the adjusted basis of the property transferred is to be recognized as gain. That section, of course, was not in effect in the year before us, 1953, and we find no indication in its legislative history that it was intended to be a clarification of the law prior to its enactment.

*Decision will be entered under Rule 50.*

---

resulting additional depreciation charges are, of course, an offset to ordinary income. Thus, in effect, the immediate payment of a capital-gains tax has been substituted for the elimination, over a period of years, of the corporate income taxes on an equivalent amount. The substantial differential between the capital-gains rate and the ordinary rates makes such a substitution highly advantageous when the sale may be carried out without loss of control over the asset because the corporation to which the asset is sold is controlled by the individuals who make the sale.

Section 310 of this bill eliminates the tax advantage from such transactions by denying capital-gains treatment to the transferor with respect to sales or exchanges of depreciable property * * * between an individual and a corporation, more than half [enacted as more than 80 per cent] of the outstanding stock of which is owned by or for him directly or indirectly. * * *